[No. A109149. First Dist., Div. One. May 29, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL JOHN SULLIVAN, Defendant and Appellant.

528

532

**COUNSEL**

Rodger Paul Curnow, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Catherine A. Rivlin and Allen R. Crown, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SWAGER, J.**—Defendant was convicted following a jury trial of six counts of robbery (Pen. Code, §§ 211–212.5).[1] The jury also found that defendant suffered prior strike convictions (§ 1170.12, subds. (b), (c)), two prior serious felony convictions (§ 667, subd. (a)), and served two prior state prison terms

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

(§ 667.5, subd. (b)). He was sentenced under the "Three Strikes" law to an aggregate state prison term of 210 years to life.

In this appeal, defendant claims that his waiver of the right to counsel was invalid, his request for appointment of advisory counsel was improperly denied, and he was denied the right to appointed counsel in the bifurcated proceeding on the prior conviction allegations. He also argues that the robbery statute is unconstitutionally vague, his motion for severance of counts 5 and 6 from the remaining charges was erroneously denied, he was denied the right to a pretrial lineup, and his conviction on one of the robbery counts is not supported by the evidence. Finally, he complains of instructional and sentencing errors. We conclude that no prejudicial errors were committed in the resolution of defendant's motions before and during trial related to his right to counsel, the robbery statute is not vague, no instructional error occurred, the robbery convictions are all supported by the evidence, and defendant's sentence did not violate any constitutional principles. We therefore affirm the judgment.

## STATEMENT OF FACTS

The convictions are based upon a series of six robberies that occurred between early January and late March of 1996 in Concord, Orinda and Antioch. All of the robberies were similar in the method of commission: each was committed in a bank in the afternoon shortly before the scheduled close of business by a sole perpetrator who gave the bank teller a note with a demand for money and a warning that the robber possessed a gun. The disputed issue at trial was the identity of the robber.[2]

*The Home Savings in Concord (Count 1)*

Five or 10 minutes before the 6:00 p.m. closing time on Friday, January 5, 1996, at the Home Savings of America branch office on Clayton Road in Concord, a man appeared at Christine Rauson's teller window. He displayed a note to Rauson printed in block letters that read: "It's a gun. Give me your money." The man warned Rauson "not to hit the alarm until he left." She "grabbed the cash and handed it to him." As the man left the window with the money and walked out of the bank, Rauson "hit the alarm," which activated the bank security cameras. Rauson identified photographs of the robber taken by the security cameras, but was not able to identify defendant from a pretrial photo lineup or at trial.

Lolita Kumar, the operations officer who was working at another teller window nearby, observed a man enter the bank, and run right past her to

---

[2] We will recite separately the evidence pertinent to each of the robberies.

Rauson's window. As the man then left the bank "in a hurry," Kumar "looked at his face." Rauson said to Kumar, "He took my money." Immediately after the man left the bank, Kumar locked the door and "called 911." When the police arrived, Kumar described the robber. She identified defendant as the robber from a six-person photo lineup she viewed on March 27, 1996, and at trial.

*The World Savings Bank in Concord (Count 2)*

Barbara Lyons testified that she was working at the "end of the teller line" at World Savings on Clayton Road in Concord about 1:00 p.m. on January 13, 1996, as the bank was "just getting ready to close." Lyons asked a man in line if she "could help him." The man directed Lyons to read a note that stated, "I have a gun," and ordered her to hand over "all your large." Lyons refused to give the man any money, and activated the alarm. The man then turned to Corey Ryan, a part-time employee, and said, "I want you to give me all your money." Ryan replied, "No problem sir," and gave him the money from the drawer next to Lyons. Lyons whispered to the bank supervisor, Shirley Warren, "that she was being robbed." Lyons and Warren looked at the man as he took the money from Ryan and walked out of the bank. They both identified photographs of the robber taken by bank security cameras, and identified defendant as the robber at trial, although they did not identify his picture in the pretrial photo lineup.

*The Home Savings in Orinda (Count 3)*

The Home Savings branch office on Brookwood Road in Orinda was robbed about 3:30 p.m. on January 16, 1996. The branch manager Margaret Teufel testified that a man she assisted at one of the teller windows put a small printed note in her face "that said, 'I have a gun. Give me all your money.' " When Teufel responded affirmatively to the man's question, "can you read?" he said, "Well, do it." Teufel took the money from her cash drawer and placed it on the counter. The man stuffed the money in his pocket and left the bank. Teufel activated the alarm and bank security camera. Teufel gave a description of the robber to the police that matched defendant's appearance, then identified him as the robber from the photo lineup and again at trial.

*The Wells Fargo Bank in Orinda (Count 4)*

On February 8, 1996, "just before" the Wells Fargo Bank office on Moraga Way in Orinda was scheduled to close at 4:00 p.m., someone approached the teller window of Susan Mills with a handwritten note directing her "to give him all [her] large bills." The man then told Mills to "hurry up," so she gave

him the "larger bills" from her lower drawer. As soon as the man started to leave the bank, Mills pressed the alarm, but the man was already "out before they got a picture of him." Mills gave a fairly accurate description of defendant to the police, and although she identified him as the robber at trial, she had not been able to identify defendant's picture from a photo lineup shown to her by the FBI.

Gerri Batiza, who was "working for Wells Fargo in Orinda," also saw defendant in the bank when the robbery occurred. Batiza was "walking across the lobby" when she noticed a tall, "striking" man she "didn't recognize" enter the bank and walk to the teller line. Batiza "went to the ATM's," then heard one of the tellers yell out "that they had been robbed." Batiza asked, "Was it that guy in line, the tall guy?" She identified defendant from an FBI photo lineup and at trial as the man she observed in the bank on the day of the robbery.

### The Bank of America in Antioch (Count 5)

Nicole Lopez was engaged in her duties as a teller at the Bank of America on East 18th Street in Antioch on February 27, 1996, at 5:53 p.m., when a man appeared at her window with a note that read in part, "Have a gun," in large, printed letters. The man with the note said, " 'Don't do anything stupid,' and 'Don't press any buttons.' " In compliance with bank policy, training, and federal banking regulations, Lopez cooperated with the demand and did not offer resistance. Lopez "scooped up a bunch of money" and "handed it to him." After the man grabbed the money and walked away, Lopez pushed the silent alarm and video camera buttons beneath her counter, and advised the manager that she had been robbed. She gave a general description of the robber—tall, male Caucasian, with long hair and a ponytail, wearing a baggy sweater and corduroy pants—that matched defendant's appearance. She also stated that photographs taken by the security cameras at Bank of America and during the World Savings Bank robbery depicted the man who robbed her. She did not select from any of the six photographs shown to her by the FBI. Lopez testified at trial that defendant "appear[ed] to be" the robber, but could not "say for sure."

### The Citibank in Concord (Count 6)

Taxi driver Martin Grocholski testified that on March 20, 1996, he picked up defendant at the Concord BART (Bay Area Rapid Transit) station between 5:30 and 5:45 p.m. Defendant stated that he "wanted to go to Treat Boulevard in the 5000 block," and "needed to be there before 6:00." The address indicated by defendant was mistaken, so Grocholski made a brief stop at a Shell gas station, before driving defendant to a Coco's restaurant on Treat

Boulevard adjacent to the Concord Citibank. Defendant left the cab briefly, ostensibly to make a telephone call, returned, then gave Grocholski $10 to wait while he "went back into Coco's restaurant."

About 5:55 p.m., Marc Pattison, a customer waiting in line at the Citibank on Treat Boulevard in Concord, noticed defendant, who resembled a friend, standing in line behind him. Pattison went to the teller on the right; defendant went to the teller on the left. Defendant's teller, Teresa Watson, testified that defendant "slouched forward" as if to block her window and pushed a note toward her that said, "I have a gun. Give me all your large bills." When Watson hesitated momentarily, defendant told her, "Do it." Watson gave defendant her large bills, which he folded and put in his pocket. Defendant left the bank through the Treat Boulevard exit.

Watson alerted her manager and fellow employee Parvin Kashabi-Enright that she "had just been robbed." Enright noticed defendant, who was "dressed oddly" in a sweater and looked uncomfortable, as he left the bank, crossed the street, and walked to a cab "on the side of Coco's" restaurant. The bank doors were locked and the police were immediately notified of the robbery.

About five minutes after defendant left Grocholski's cab parked in front of Coco's restaurant, he returned. He "rushed to the cab," hopped inside, and hurriedly removed his sweater. Defendant was "nervous"; his behavior made Grocholski uneasy. Defendant directed Grocholski to drive to the Pleasant Hill BART station. As Grocholski drove along Treat Boulevard less than a "quarter mile" from the bank, he was "pulled over by a police officer and stopped."

Defendant was removed from the cab by Concord police officers and placed in handcuffs. Watson and Pattison were taken to the scene of the detention, where they were asked to look at a "suspect." Although defendant had removed his sweater, and his hair was no longer "pulled back," they both positively identified him at the scene and at trial as the robber. Defendant was then placed under arrest. Enright identified defendant from a photo lineup and at trial as "the person who robbed the bank."

Watson also recognized a sweater taken from the cab as the one worn by defendant in the bank. Seized from defendant were a "wad of American currency" in the amount of $2,200, and a note with the words, "Have a gun. Give me all large everything now." Watson identified the note taken from defendant as the one he showed her in the bank. Two other notes were found in defendant's front pants pocket: one with telephone numbers written on it; another with the address of Concord Citibank, 4420 Treat Boulevard.

*The Defense Evidence*

The defense produced evidence on the vagaries of eyewitness testimony from Dr. Martin Blinder, a psychiatrist with expertise in the field of eyewitness identification. Dr. Blinder explained the "mechanisms by which eyewitnesses make identifications" and "counterintuitive elements that can mislead the eyewitness." He stated that certain factors in the "three stages" of identification—perception, storage, and retrieval—may mislead "the eyewitness, though perfectly sincere and often persuasive," into making an inaccurate identification. In the "perception" stage, in addition to the "obvious physical factors"—such as lighting, proximity, and duration of observation— the "state of mind of the witness" and quality of perception is influenced by the degree of anxiety associated with the event, the "nature of the event[] being observed," the presence of a weapon, familiarity with the subject, and the "expectation" of the observer. The "storage" stage is adversely affected by "decay" of memory, particularly short-term memory, and "misinformation," such as repetitious exposures or identifications, that contaminate memory and rearrange facts. Dr. Blinder testified that the retrieval process is tainted by "pushy" questioning of a witness and suggestive identification procedures, specifically the "showup process." He added that the degree of confidence in an identification asserted by the witness does not correlate with its accuracy. Although Dr. Blinder did not offer any opinion on the reliability of the eyewitness identifications in the present case, he testified that the stress associated with the crimes, the "elements of suggestiveness" inherent in the "showup" conducted at the scene of defendant's detention, and the long delay between the robberies and the identifications in court, all militated against accuracy.

Defendant presented alibi evidence related to count 3, the robbery of Home Savings in Orinda on January 16, 1996. His friend Dolores Deufemia testified that on that date defendant was at her house, along with a few other friends, from around noon until 7:00 or 8:00 p.m., helping her "pack and move" before she began to serve a sentence the next day for a drug conviction.[3]

As to count 6, the defense offered evidence that Citibank teller Teresa Watson stated to a private investigator that when she and Marc Pattison were transported to the detention scene to view defendant they "discussed the description of the subject," and the transporting officer claimed "they had the responsible and they had him detained and they just needed them to ID him." Finally, evidence was presented that defendant's fingerprints were not identified at the scene of any of the robberies.

---

[3] Deufemia admitted that she had "a long rap sheet."

## DISCUSSION

I. *The Vagueness of the Bank Robbery Statute.*

Defendant presents a novel challenge to the constitutionality of section 211, the "robbery statute" under which he was prosecuted and ultimately convicted. He claims section 211 is "impermissibly vague" due to the failure of the statute to provide an adequate definition of "bank robbery." For purposes of comparison, defendant points out that in section 1192.7, subdivision (c), which designates "serious felonies," the offense of "bank robbery" is defined differently and more comprehensively: not only by inclusion of a specific reference to a taking of property from a bank, credit union or savings and loan association, but also with an explanation that the offense is committed by means of "force or violence, or by intimidation" exerted upon the victim, rather than "against his will, accomplished by means of force or fear" as specified in section 211. Defendant complains that in light of the "significant differences" between the two statutes and the jury instruction given by the trial court "only as to the general definition of robbery" pursuant to section 211, "as opposed to bank robbery," the jury was left without proper guidance in consideration of "the lesser included offense in this case, namely grand theft."

■ Our analysis of this issue is guided by well-established legal principles. " 'The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution, each guarantee that no person shall be deprived of life, liberty, or property without due process of law. This constitutional command requires "a reasonable degree of certainty in legislation, especially in the criminal law . . . ." [Citation.] "[A] penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." ' [Citation.]" (*People v. Maciel* (2003) 113 Cal.App.4th 679, 683 [6 Cal.Rptr.3d 628]; see also *People v. Bamba* (1997) 58 Cal.App.4th 1113, 1120 [68 Cal.Rptr.2d 450]; *People v. Kelly* (1992) 1 Cal.4th 495, 533 [3 Cal.Rptr.2d 677, 822 P.2d 385].) " 'No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the state commands or forbids.' [Citation.]" (*People v. Campbell* (2000) 82 Cal.App.4th 71, 79 [97 Cal.Rptr.2d 830].) "When definite guidelines are absent, a criminal statute may deny due process by allowing a ' "standardless sweep" ' by which police, prosecutors and juries may indulge their personal predilections. [Citation.]" (*In re M.S.* (1995) 10 Cal.4th 698, 717 [42 Cal.Rptr.2d 355, 896 P.2d 1365].) "Consequently, the 'void for vagueness' doctrine dictates that the terms of a penal statute must be explicit enough to inform those who are subject to it what conduct on their

part will render them liable to its penalties. A statute which requires individuals of ordinary intelligence to guess at its meaning and differ as to its application violates due process." (*People v. Prevost* (1998) 60 Cal.App.4th 1382, 1394 [71 Cal.Rptr.2d 487].) ·

(2) "To withstand a facial vagueness challenge, a penal statute must satisfy two basic requirements. First, the statute must be definite enough to provide adequate notice of the conduct proscribed. [Citation.] Ordinary people of common intelligence have to be able to understand what is prohibited by the statute and what may be done without violating its provisions. [Citation.] [¶] Second, the statute must provide sufficiently definite guidelines. A vague law impermissibly delegates basic policy matters to the police, judges and juries for resolution on a subjective basis, with the attendant risk of arbitrary and discriminatory enforcement." (*People v. Ellison* (1998) 68 Cal.App.4th 203, 207 [80 Cal.Rptr.2d 120]; see also *People v. Moore* (1999) 75 Cal.App.4th 37, 44 [88 Cal.Rptr.2d 914].)

"However, '[t]he starting point of our analysis is "the strong presumption that legislative enactments 'must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. . . .' " [Citation.]' [Citation.]" (*People v. Albritton* (1998) 67 Cal.App.4th 647, 657 [79 Cal.Rptr.2d 169]; see also *People v. Campbell, supra,* 82 Cal.App.4th 71, 79–80.) "Only a reasonable degree of certainty is required and there is a strong presumption in favor of the constitutionality of statutes; thus a statute will not be held void for uncertainty if any reasonable and practical construction can be given to its language." (*People v. Misa* (2006) 140 Cal.App.4th 837, 844 [44 Cal.Rptr.3d 805].) "The fact that a term is somewhat imprecise does not itself offend due process. Rather, so long as the language sufficiently warns of the proscribed conduct when measured by common understanding and experience, the statute is not unconstitutionally vague." (*People v. Ellison, supra,* 68 Cal.App.4th 203, 207–208.) "Inasmuch as ' "[w]ords inevitably contain germs of uncertainty," ' mathematical precision in the language of a penal statute is not a sine qua non of constitutionality. [Citation.]" (*In re M.S., supra,* 10 Cal.4th 698, 718.)

"Although a particular statute is somewhat vague or general in its language because of difficulty in defining the subject matter with precision, it will be upheld if its meaning is reasonably ascertainable. [Citation.] Courts must view the statute from the standpoint of the reasonable person who might be subject to its terms. Thus, '[i]t is not necessary that a statute furnish detailed plans and specifications of the acts or conduct prohibited. The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding.' [Citation.]" (*People v. Deskin* (1992) 10 Cal.App.4th 1397, 1400 [13

Cal.Rptr.2d 391]; see also *People v. Prevost, supra*, 60 Cal.App.4th 1382, 1394; *People v. Ervin* (1997) 53 Cal.App.4th 1323, 1328 [62 Cal.Rptr.2d 231]; *People v. Heilman* (1994) 25 Cal.App.4th 391, 400 [30 Cal.Rptr.2d 422]; *People v. Gamez* (1991) 235 Cal.App.3d 957, 971–972 [286 Cal.Rptr. 894].) The terms of a statute, "although nonmathematical, are not impermissibly vague if their meaning can be objectively ascertained by reference to common experiences of mankind." (*Suter v. City of Lafayette* (1997) 57 Cal.App.4th 1109, 1133 [67 Cal.Rptr.2d 420].)

■ The only vagueness we perceive is in defendant's argument, not in the general robbery statute, either on its face or as applied to defendant. " 'Robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." [Citation.]' " (*People v. Vargas* (2002) 96 Cal.App.4th 456, 463 [116 Cal.Rptr.2d 867], quoting *People v. O'Neil* (1997) 56 Cal.App.4th 1126, 1131 [66 Cal.Rptr.2d 72].) The requirement of use of force or fear has no technical meaning which must be explained to jurors, but rather the terms articulated in the statute have established common meaning. (See *People v. Anderson* (1966) 64 Cal.2d 633, 640 [51 Cal.Rptr. 238, 414 P.2d 366]; *People v. Wright* (1996) 52 Cal.App.4th 203, 210–211 [59 Cal.Rptr.2d 316].) The failure of section 211 to define *bank* robbery does not render the statute vague. Defendant was not charged in the information with robbery of *banks*, but rather with robbery of *persons* who happened to be bank employees.[4] The language of the statute is sufficiently clear and settled to provide notice of the proscribed conduct and enable those charged with its violation to properly prepare a defense. (See *People v. Ervin, supra*, 53 Cal.App.4th 1323, 1329; *People v. Zucker* (1960) 177 Cal.App.2d 172, 177–178 [2 Cal.Rptr. 112].) Section 211 is not unconstitutionally vague.

II. *The Validity of Defendant's Waiver of the Right to Counsel.*

Defendant argues that he was denied the right to counsel. Defendant exercised his right of self-representation under *Faretta v. California* (1975) 422 U.S. 806, 820 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*), but claims his waiver of the right to counsel was defective for lack of proper admonitions. Defendant does not claim his waiver of the right to counsel was other than voluntary, but rather that the record fails to show "the warnings required by *Faretta* <u>were</u> given." He argues that therefore "this court as a matter of law" must find the waiver of the right to counsel was not "knowing and intelligent" and reverse the judgment.

---

[4] We observe that section 1192.7, subdivision (c), does not define a separate criminal offense, but instead only delineates the nature of a criminal conviction that may be used to enhance punishment.

■ "A defendant in a criminal case possesses two constitutional rights with respect to representation that are mutually exclusive." (*People v. Marshall* (1997) 15 Cal.4th 1, 20 [61 Cal.Rptr.2d 84, 931 P.2d 262].) "[T]he Sixth Amendment guarantees a defendant a right to counsel but also allows him to waive this right and to represent himself without counsel." (*U.S. v. Erskine* (9th Cir. 2004) 355 F.3d 1161, 1167, italics omitted; see also *People v. Williams* (2003) 110 Cal.App.4th 1577, 1585 [2 Cal.Rptr.3d 890].) "Criminal defendants have the right both to be represented by counsel at all critical stages of the prosecution and the right, based on the Sixth Amendment as interpreted in *Faretta, supra,* 422 U.S. 806, to represent themselves." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1001 [47 Cal.Rptr.3d 467, 140 P.3d 775].) Thus, in any case in which a *Faretta* request for self-representation has been made, the court must evaluate, sometimes under problematic circumstances, two countervailing considerations: on one hand, the defendant's absolute right to counsel, which must be assiduously protected; on the other hand, the defendant's unqualified constitutional right to discharge counsel if he pleases and represent himself.

A criminal defendant may not waive his right to counsel, however, "unless he does so 'competently and intelligently,' [citations]." (*Godinez v. Moran* (1993) 509 U.S. 389, 396 [125 L.Ed.2d 321, 113 S.Ct. 2680].) "The right to representation by counsel persists until a defendant affirmatively waives it, and courts indulge every reasonable inference against such waiver." (*People v. Dunkle* (2005) 36 Cal.4th 861, 908 [32 Cal.Rptr.3d 23, 116 P.3d 494].) "[T]he waiver of counsel must be *knowing and voluntary*—that is, the defendant must 'actually . . . understand the significance and consequences' of the decision, and the decision must be 'uncoerced' [citations]." (*People v. Stewart* (2004) 33 Cal.4th 425, 513 [15 Cal.Rptr.3d 656, 93 P.3d 271].) " 'The purpose of the "knowing and voluntary" ' " inquiry " 'is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced. . . .' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 733–734 [85 Cal.Rptr.2d 203, 976 P.2d 754].)

■ " 'When confronted with a request' for self-representation, 'a trial court must make the defendant "aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' " [Citation.] . . .' [Citation.]" (*People v. Stanley* (2006) 39 Cal.4th 913, 932 [47 Cal.Rptr.3d 420, 140 P.3d 736]; see also *Godinez v. Moran, supra,* 509 U.S. 389, 401.) "In order to deem a defendant's *Faretta* waiver knowing and intelligent," the trial court "must insure that he understands 1) the nature of the charges against him, 2) the possible penalties, and 3) the 'dangers and disadvantages of self-representation.' [Citation.]" (*U.S. v. Erskine, supra,* 355 F.3d 1161, 1167.) The admonishments must also "include the defendant's inability to rely upon

the trial court to give personal instruction on courtroom procedure or to provide the assistance that otherwise would have been rendered by counsel. Thus, a defendant who chooses to represent himself, or herself after knowingly, intelligently, and voluntarily forgoing the assistance of counsel assumes the risk of his or her own ignorance, and cannot compel the trial court to make up for counsel's absence." (*People v. Barnum* (2003) 29 Cal.4th 1210, 1214–1215 [131 Cal.Rptr.2d 499, 64 P.3d 788].) The defendant "should at least be advised that: self-representation is almost always unwise and that the defense he conducts might be to his detriment; he will have to follow the same rules that govern attorneys; the prosecution will be represented by experienced, professional counsel who will have a significant advantage over him in terms of skill, training, education, experience, and ability; the court may terminate his right to represent himself if he engages in disruptive conduct; and he will lose the right to appeal his case on the grounds of ineffective assistance of counsel. [Citation.] In addition, he should also be told he will receive no help or special treatment from the court and that he does not have a right to standby, advisory, or cocounsel. [Citation.] [¶] While this list of issues is not exhaustive, it demonstrates that there are a number of matters the court must ask about and consider before ruling on a defendant's request to represent himself." (*People v. Phillips* (2006) 135 Cal.App.4th 422, 428 [37 Cal.Rptr.3d 539].)

"No particular form of words, however, is required in admonishing a defendant who seeks to forgo the right to counsel and engage in self-representation. ' "The test of a valid waiver of counsel is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." ' [Citation.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 140 [115 Cal.Rptr.2d 614, 38 P.3d 461].) If the trial court's warnings communicate powerfully to the defendant the "disadvantages of proceeding pro se," that is all *Faretta* requires." (*Lopez v. Thompson* (9th Cir. 2000) 202 F.3d 1110, 1118.) Our waiver inquiry "must be pragmatic," and focused upon "the status of the defendant's knowledge and understanding at the time of the purported waiver." (*U.S. v. Erskine, supra*, 355 F.3d 1161, 1171, 1170.) "The requirement is met if the record establishes the defendant is literate and understanding and has voluntarily exercised the choice of representing himself." (*People v. McArthur* (1992) 11 Cal.App.4th 619, 627 [14 Cal.Rptr.2d 203].) The "information a defendant must have to waive counsel intelligently will 'depend, in each case, upon the particular facts and circumstances surrounding that case' [citation]." (*Iowa v. Tovar* (2004) 541 U.S. 77, 92 [158 L.Ed.2d 209, 124 S.Ct. 1379].)

"A defendant may challenge the grant of a motion for self-representation on the basis the record fails to show the defendant was made

aware of the risks of self-representation." (*People v. Noriega* (1997) 59 Cal.App.4th 311, 319 [69 Cal.Rptr.2d 127].) " 'Whether there has been a waiver is a question of fact.' [Citation.]" (*People v. $241,600 United States Currency* (1998) 67 Cal.App.4th 1100, 1109 [79 Cal.Rptr.2d 588]; see also *People v. Rosso* (1994) 30 Cal.App.4th 1001, 1006 [36 Cal.Rptr.2d 218].) "*The burden is on the defendant* to demonstrate he did not knowingly and intelligently waive his right to counsel." (*People v. McArthur, supra,* 11 Cal.App.4th 619, 627, italics added; see also *Benge v. Superior Court* (1980) 110 Cal.App.3d 121, 129–130 [167 Cal.Rptr. 714].) On appeal, the courts "review the entire record—including proceedings after the purported invocation of the right of self-representation—and determine de novo whether the defendant's invocation was knowing and voluntary. [Citations.] Even when the trial court has failed to conduct a full and complete inquiry regarding a defendant's assertion of the right of self-representation, these courts examine the entire record to determine whether the invocation of the right of self-representation and waiver of the right to counsel was knowing and voluntary." (*People v. Marshall, supra,* 15 Cal.4th 1, 24; see also *U.S. v. Erskine, supra,* 355 F.3d 1161, 1166–1167; *People v. Stanley, supra,* 39 Cal.4th 913, 932; *People v. Koontz* (2002) 27 Cal.4th 1041, 1070 [119 Cal.Rptr.2d 859, 46 P.3d 335].)

We also observe that even where a defendant enters a guilty plea and waives the three attendant constitutional rights in doing so—the right to a jury trial, the right to confront and cross-examine witnesses, and the privilege against self-incrimination—the failure of the record to disclose the proper advisements and waivers does not require per se reversal. (*People v. Howard* (1992) 1 Cal.4th 1132, 1175, 1179 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) As with the examination of the validity of the waiver of the right to counsel, the appropriate inquiry to determine if a plea was valid is whether the record affirmatively shows it was " 'voluntary and intelligent under the totality of the circumstances' . . . ." (*People v. Mosby* (2004) 33 Cal.4th 353, 360 [15 Cal.Rptr.3d 262, 92 P.3d 841], italics omitted, quoting *People v. Howard, supra,* at p. 1175; *People v. Christian* (2005) 125 Cal.App.4th 688, 694 [22 Cal.Rptr.3d 861]; *People v. Guzman* (1993) 14 Cal.App.4th 1420, 1422–1423 [18 Cal.Rptr.2d 380].) The appropriate standard of appellate review is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." (*North Carolina v. Alford* (1970) 400 U.S. 25, 31 [27 L.Ed.2d 162, 91 S.Ct. 160]; see *People v. Allen* (1999) 21 Cal.4th 424, 437 [87 Cal.Rptr.2d 682, 981 P.2d 525]; *People v. Howard, supra,* at p. 1177.) "That approach—reviewing the whole record, instead of just the record of the plea colloquy—was recently endorsed by the United States Supreme Court in a case where a federal court failed, before accepting the defendant's guilty plea, to advise the defendant of his right to counsel as required by rule 11 of the Federal Rules of Criminal Procedure."

(*People v. Mosby, supra,* at p. 361.) "[T]hat the docket sheet fails to specifically recite that defendant expressly and explicitly waived his rights does not as a matter of law preclude a finding that defendant's waiver was constitutionally valid." (*People v. Anderson* (1991) 1 Cal.App.4th 318, 325 [1 Cal.Rptr.2d 676], italics omitted.)

Our inquiry into the validity of defendant's waiver of the right to counsel in the present case is impacted and impaired by the lack of a complete record of the myriad of proceedings in the municipal and superior courts, particularly the missing critical reporter's transcript of the hearing on his *Faretta* motion on May 20, 1996.[5] We know from the minute order of the hearing on that date that after defendant's *Marsden*[6] motion for substitution of counsel was denied, he moved to act as his own attorney. We also know that the motion was then granted, defendant's right to counsel was expressly waived, and thereafter in all proceedings in both municipal and superior court defendant represented himself. Without the reporter's transcript of the hearing on the *Faretta* motion, however, we do not have before us the content of any warnings given or inquiry made by the trial court before the waiver of defendant's right to counsel was accepted. Thus, no error affirmatively appears in the record on appeal.[7]

---

[5] The record of the *Faretta* hearing is not a "silent" one, which reveals the absence of advisements, but rather an unavailable and missing record. "Truly silent-record cases are those that show no express advisement or waiver of [constitutional] rights . . . ." (*People v. Mosby, supra,* 33 Cal.4th 353, 361–362.) For the benefit of the parties this court attempted to obtain the reporter's transcript of the hearing on May 20, 1996; we have been advised that it is not available due to the lengthy passage of time.

We also observe that when a transcript of proceedings in the trial court is unavailable, rule 8.130(g) of the California Rules of Court provides that a party "may then substitute an agreed or settled statement for that portion of the designated proceedings by complying with either (A) or (B)." Following notice given, a "party may move in superior court to use a settled statement. If the court grants the motion, the statement must be served, filed, and settled as rule 8.137 provides, but the order granting the motion must fix the times for doing so." (Cal. Rules of Court, rule 8.130(g)(1)(B).) Pursuant to California Rules of Court, rule 8.137(a)(1), an "appellant wanting to proceed" with a "settled statement" must file a motion in superior court "to use a settled statement" instead of a reporter's transcript; the motion must be supported by a showing that the "designated oral proceedings were not reported or cannot be transcribed . . . ." (Cal. Rules of Court, rule 8.137(a)(2)(B).) Defendant's proper remedy for the unavailability of portions of the transcript was to obtain "a settled statement of the oral proceedings prepared by the parties and settled by the judge who heard the matter[,] or an agreed statement prepared by the parties" and "consisting of a condensed statement of the relevant proceedings." (*Le Font v. Rankin* (1959) 167 Cal.App.2d 433, 436-437 [334 P.2d 608].) His failure to utilize the settled statement procedure has left this court with a "record which is wholly inadequate to enable it to review the error complained of." (*Ehman v. Moore* (1963) 221 Cal.App.2d 460, 463 [34 Cal.Rptr. 540].)

[6] *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].

[7] As it would, for instance, if we could consult the transcript and determine that defective or inadequate admonitions were given.

"Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573 [43 Cal.Rptr.3d 741].) " 'We must indulge in every presumption to uphold a judgment, and it is defendant's burden on appeal to affirmatively demonstrate error—it will not be presumed. [Citation.]' [Citations.]" (*People v. Tang* (1997) 54 Cal.App.4th 669, 677 [62 Cal.Rptr.2d 876].) Not only does the defendant bear the burden of demonstrating an invalid waiver of the right to counsel, but the defendant further bears the burden to provide a record on appeal which affirmatively shows that there was an error below, and any uncertainty in the record must be resolved against the defendant. (*People v. $17,522.08 United States Currency* (2006) 142 Cal.App.4th 1076, 1084 [48 Cal.Rptr.3d 519]; *People v. McArthur, supra,* 11 Cal.App.4th 619, 627.)

Also implicated in the present case by the state of the record on appeal is the rule articulated in Evidence Code section 664 " 'that a trial court is presumed to have been aware of and followed the applicable law. (*Howard* v. *Thrifty Drug & Discount Stores* (1995) 10 Cal.4th 424, 443 [41 Cal.Rptr.2d 362, 895 P.2d 469] ["[A]n appellate court must presume that the decision of the trial court is correct."] . . . .)' " (*People v. Martinez* (1998) 65 Cal.App.4th 1511, 1517 [77 Cal.Rptr.2d 492], quoting *People v. Mosley* (1997) 53 Cal.App.4th 489, 496–497 [62 Cal.Rptr.2d 268].) " '[I]t is settled that: "A judgment or order of the lower court is *presumed correct.* All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error." [Citation.]' [Citation.]" (*People v. Alvarez* (1996) 49 Cal.App.4th 679, 694 [56 Cal.Rptr.2d 814].) "The orders of the trial court are presumed to be valid and defendant has the burden of providing a record adequate to support his arguments on appeal." (*People v. Malabag* (1997) 51 Cal.App.4th 1419, 1427 [59 Cal.Rptr.2d 847].)

█ Pursuant to Evidence Code section 664, "Court and counsel are presumed to have done their duty in the absence of proof to the contrary." (*Newman v. Los Angeles Transit Lines* (1953) 120 Cal.App.2d 685, 691 [262 P.2d 95]; see also *In re B.A.* (2006) 141 Cal.App.4th 1411, 1420 [47 Cal.Rptr.3d 115].) The general rule is " 'that a trial court is presumed to have been aware of and followed the applicable law. [Citations.]' [Citations.] This rule derives in part from the presumption of Evidence Code section 664 'that official duty has been regularly performed.' " (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114 [6 Cal.Rptr.3d 723, 79 P.3d 1030].) The effect of the rebuttable presumption created by section 664 is " 'to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact.' [Citation.]" (*California Advocates for Nursing Home*

*Reform v. Bonta'* (2003) 106 Cal.App.4th 498, 505 [130 Cal.Rptr.2d 823]; see also *People v. Acevedo* (2003) 105 Cal.App.4th 195, 198 [129 Cal.Rptr.2d 270].)

Without the record, we must presume that the court regularly performed the lawful duty of informing defendant of the dangers and disadvantages of self-representation, and the consequences of his decision, before accepting his express waiver of his right to counsel. (See *People v. Jackson* (1996) 13 Cal.4th 1164, 1213 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *In re B.A., supra,* 141 Cal.App.4th 1411, 1420; *People v. Stewart* (2004) 117 Cal.App.4th 907, 911 [12 Cal.Rptr.3d 171]; *People v. Burnett* (2004) 116 Cal.App.4th 257, 261 [9 Cal.Rptr.3d 885].) "We presume that the court properly performed its duty and received an effective waiver of counsel" before granting the *Faretta* motion. (*In re Grayson* (1966) 242 Cal.App.2d 110, 114 [51 Cal.Rptr. 145].) The minute order states that defendant waived the right to counsel upon his own motion, but the record fails to show "what the judge said at that time." (*People v. Sharp* (1959) 174 Cal.App.2d 520, 521 [344 P.2d 796].) Under these circumstances, "There is a presumption that 'official duty has been regularly performed[,]' [citation], which of course includes a presumption that defendant was duly . . . advised of his right to counsel" before entering the waiver. (*Id.* at p. 522.) When presented with a claim that the court failed to admonish defendant of his rights before accepting his waiver, without a transcript of the proceeding we are "justified in relying on the presumption that official duty was regularly performed." (*In re Helen J.* (1973) 31 Cal.App.3d 238, 243 [107 Cal.Rptr. 106]; see also *People v. Lucas* (1995) 12 Cal.4th 415, 443 [48 Cal.Rptr.2d 525, 907 P.2d 373]; *Serrano v. Workmen's Comp. Appeals Bd.* (1971) 16 Cal.App.3d 787, 790–791 [94 Cal.Rptr. 511].) Since the record on appeal fails to support defendant's claim that he was uninformed when he waived the right to counsel in municipal court, he has failed to satisfy his burden on appeal. (*People v. $17,522.08 United States Currency, supra,* 142 Cal.App.4th 1076, 1084; *In re Helen J., supra,* at p. 243; *People v. Sharp, supra,* at p. 522.)

The record does affirmatively show, however, that defendant was not properly readvised of the risks and consequences of proceeding without counsel when he was arraigned in superior court, as section 987 requires.[8] Unlike the absent record of the *Faretta* waiver in municipal court, we have before us the reporter's transcript of the arraignment, and defendant was not then admonished in any form of the right to counsel, nor did he expressly

---

[8] Section 987, subdivision (a), reads: "In a noncapital case, if the defendant appears for arraignment without counsel, he or she shall be informed by the court that it is his or her right to have counsel before being arraigned, and shall be asked if he or she desires the assistance of counsel. If he or she desires and is unable to employ counsel the court shall assign counsel to defend him or her."

waive the right to counsel.[9] Despite our finding of a valid waiver of the right to counsel in municipal court, the waiver did not continue in effect in superior court without proper renewal of admonitions. (*People v. Crayton* (2002) 28 Cal.4th 346, 360 [121 Cal.Rptr.2d 580, 48 P.3d 1136]; *People v. McKenzie* (1983) 34 Cal.3d 616, 635–637 [194 Cal.Rptr. 462, 668 P.2d 769]; *Lempert v. Superior Court* (2003) 112 Cal.App.4th 1161, 1171 [5 Cal.Rptr.3d 700]; *People v. Sohrab* (1997) 59 Cal.App.4th 89, 99–102 [68 Cal.Rptr.2d 749], disapproved on other grounds in *People v. Crayton, supra*, at p. 366, fn. 10.) We must conclude that the trial court erred by failing to inform defendant of his right to appointed counsel and to expressly obtain a waiver of that right when defendant was arraigned on the felony information. (*People v. Crayton, supra*, at pp. 363–364.)

The error, however, is "susceptible to harmless error analysis." (*People v. Crayton, supra*, 28 Cal.4th 346, 365.) Where, as here, a defendant charged with a felony has waived counsel under circumstances that demonstrate an intention to represent himself, "a superior court's failure to readvise the defendant and obtain a new waiver of counsel at the defendant's arraignment on the information in superior court, although erroneous under the governing California statute, does not automatically require reversal of the ensuing judgment of conviction."[10] (*Crayton*, at p. 350.) Instead, "the prejudicial effect of such error must be evaluated under the harmless error standard set forth in [*People v. Watson* (1956)] 46 Cal.2d 818, 836 [299 P.2d 243] . . . ." (*Ibid.*) Under the governing "*Watson* standard" the judgment "is not reversible unless there is a reasonable probability that the defendant was prejudiced as a result of the error." (*Id.* at p. 364.) More specifically, we examine whether there is a "reasonable probability that defendant was unaware of his right to be represented by appointed counsel at trial or that he would have accepted the appointment of counsel had the court made the statutorily required inquiry at arraignment." (*Id.* at p. 365.) "The complete record of the trial court proceedings often will shed light upon whether a defendant, despite the absence of an explicit readvisement by the superior court at arraignment, nonetheless was aware that he or she had the right to appointed counsel at the

---

[9] The record of the arraignment is thus truly a "silent" one, which reveals the absence of advisements.

[10] In contrast, when the record demonstrates that the trial judge neglected to advise the defendant of the dangers and disadvantages of self-representation as required by *Faretta* when the waiver is taken, but the waiver of the right to counsel was voluntary, the courts have split on the standard of reversible error: some have determined that the error is structural and reversible per se; others have declared the error must be found prejudicial under the *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824], test unless the error is harmless beyond a reasonable doubt. (See *Cordova v. Baca* (9th Cir. 2003) 346 F.3d 924, 930; *U.S. v. Erskine, supra*, 355 F.3d 1161, 1167; *U.S. v. Arlt* (9th Cir. 1994) 41 F.3d 516, 520; *People v. Wilder* (1995) 35 Cal.App.4th 489, 496 [41 Cal.Rptr.2d 463]; *People v. McArthur, supra*, 11 Cal.App.4th 619, 629–630; *People v. Hall* (1990) 218 Cal.App.3d 1102, 1108–1109 [267 Cal.Rptr. 494]; *People v. Cervantes* (1978) 87 Cal.App.3d 281, 294 [150 Cal.Rptr. 819].)

subsequent proceedings and whether an explicit advisement at the arraignment would have been likely to lead the defendant to reconsider the decision to represent himself or herself and request that counsel be appointed." (*Ibid.*)

Upon our review of the entire record[11] we conclude that any error was harmless, and defendant's waiver of the right to counsel was both knowing and voluntary. During the excessively prolonged course of these proceedings, defendant did not falter in his assertion of his right and intention to represent himself, other than to seek advisory counsel and make an apparently aborted request for appointment of an attorney for the limited purpose of representing him in the separate, bifurcated proceeding on the prior conviction allegations. Defendant never indicated a desire to surrender his right of self-representation during the pretrial or trial proceedings.

The record is also replete with illustrations of defendant's knowledge of the difficulties and pitfalls he faced while acting as his own attorney. Defendant often mentioned and sought to use his status as a disadvantaged pro. per. defendant to request from the trial court continuances, transcripts, additional discovery, service of subpoenas, access to his "legal papers," "legal runners" and other support services, special investigative, paralegal, or other "ancillary" legal assistance, fees, and even advisory counsel to assist with the presentation of his testimony. In his motions, defendant specifically complained that "acting as his own attorney while incarcerated" placed him "at a tremendous disadvantage" when opposed by an "experienced" prosecutor with access to the "enormous" resources of the district attorney's office. Defendant also declared as part of his request for advisory counsel that if he realized "during the course of the trial" that he "is overwhelmed," advisory counsel could "step right in and take over."[12] He was advised at trial that as a "pro per defendant" he was "bound by the same rules of law that apply to a represented defendant."

 Finally, the record shows us that defendant acted as his own counsel in numerous prior criminal actions against him, and thus through considerable experience was well aware of the consequences of self-representation. " '[A] defendant's prior experience with the criminal justice system' is, as the United States Supreme Court has concluded, 'relevant to the question [of] whether he knowingly waived constitutional rights.' (*Parke v. Raley* (1992) 506 U.S. 20, 37 [121 L.Ed.2d 391, 113 S.Ct. 517].) That is so because previous experience in the criminal justice system is relevant to a recidivist's ' "knowledge and sophistication regarding his [legal] rights." ' (*Parke*, at

---

[11] The clerk's transcript alone consists of over 4,500 pages that document the inexplicable amount of time taken to bring this case to trial.

[12] The denial of the motion for advisory counsel for lack of good cause demonstrated is also at issue in this appeal.

pp. 36–37; see *United States v. Dawson* (9th Cir. 1999) 193 F.3d 1107, 1110–1111 [the defendant, who had received full advisements in state court action two months before he entered a guilty plea on incomplete advisements in federal court, knowingly waived rights of confrontation and silence despite lack of advisement on either].)" (*People v. Mosby, supra*, 33 Cal.4th 353, 365, fn. omitted.) The record before us "suggests no confusion on defendant's part" regarding the "risks of self-representation, or the complexities of his case, much less that his election to represent himself was other than voluntary." (*People v. Lawley, supra*, 27 Cal.4th 102, 142.)

We are convinced that a recitation of the dangers and disadvantages of self-representation in superior court would have led to the same result: defendant would have voluntarily proceeded without counsel; the trial would have still occurred with defendant representing himself. Nothing would have changed had defendant been advised or readvised of the dangers of self-representation. (*People v. Wilder, supra*, 35 Cal.App.4th 489, 502.) Additionally, the evidence of defendant's guilt of the charged offenses was quite overwhelming. (*Id.* at pp. 502–503.) We find that the lack of any record on appeal of the advisements given when defendant first waived his right to counsel, and the omission of further admonishments in the superior court of the significance and consequences of the decision to waive the right to counsel, did not result in prejudicial error. (*People v. Crayton, supra*, 28 Cal.4th 346, 365–366; *People v. Wilder, supra*, at pp. 502–503; *People v. McArthur, supra*, 11 Cal.App.4th 619, 629–630.) We conclude based upon our examination of the totality of the record that defendant's waiver of the right to counsel was both knowing and voluntary.

III. *The Denial of Defendant's Request for Appointment of Advisory Counsel.*

Defendant next asserts that the trial court erred by declining to appoint advisory counsel for him as he requested several times before the commencement of trial. He claims that in "the context of this case"—particularly, the "conditions in the jail," lack of proper medical attention, poor access to law books or other necessary materials, and the inadequate "ancillary services" such as legal runners to assist with his defense—the denial of his motion for advisory counsel "was decidedly an abuse of discretion."

 Once defendant elected self-representation, he did not have the constitutional right to advisory counsel to assist with his defense. (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 183–184 [79 L.Ed.2d 122, 104 S.Ct. 944]; *People v. Bloom* (1989) 48 Cal.3d 1194, 1218 [259 Cal.Rptr. 669, 774 P.2d 698].) "[C]ocounsel status, advisory counsel and other forms of 'hybrid' representation are not constitutionally guaranteed." (*People v. Clark* (1992) 3

Cal.4th 41, 111 [10 Cal.Rptr.2d 554, 833 P.2d 561].) " '[T]he powers and responsibilities which attend the representation of a criminally accused person should never be conferred jointly and equally on the accused and the attorney.' " (*People v. Stewart, supra*, 33 Cal.4th 425, 518, citing *People v. Bloom, supra*, at pp. 1218–1219.) " 'Rather, in all cases of shared or divided representation, either the accused or the attorney must be in charge. Stated otherwise, at all times the record should be clear that the accused is either self-represented or represented by counsel; the accused cannot be both at once. . . . [A] self-represented defendant who wishes to obtain the assistance of an attorney in an advisory or other limited capacity, but without surrendering effective control over [the] presentation of the defense case, may do so only with the court's permission and upon a proper showing.' [Citation.]" (*Stewart, supra*, at p. 518, quoting *People v. Bloom, supra*, at p. 1219.)

If the right of self-representation has been granted, the trial court *"may*, in its discretion, appoint counsel to 'render . . . advisory services' to a defendant who wishes to represent himself, in order to promote orderly, prompt and just disposition of the cause." (*People v. Garcia* (2000) 78 Cal.App.4th 1422, 1430 [93 Cal.Rptr.2d 796].) The court also "has 'discretion to deny as well as to grant [a motion for advisory counsel]. . . .' " (*People v. Walton* (1996) 42 Cal.App.4th 1004, 1018 [49 Cal.Rptr.2d 917], quoting *People v. Crandell* (1988) 46 Cal.3d 833, 863 [251 Cal.Rptr. 227, 760 P.2d 423].) "[A]s with other matters requiring the exercise of discretion, 'as long as there exists a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be here set aside . . . . [Citations.]' [Citation.]" (*People v. Clark, supra*, 3 Cal.4th 41, 111.)

We perceive no abuse of discretion in the trial court's failure to appoint advisory counsel to assist defendant. As we have observed, defendant had extensive familiarity and experience with the justice system, having acted as his own attorney many times in the past. He demonstrated his competence and ability to act as his own attorney during pretrial proceedings in the present case by making a plethora of motions that related to admission of evidence, presentation of defenses, discovery, and ancillary legal services, among other requests from the court and the prosecution. At trial, defendant vigorously and effectively pursued his defenses of misidentification and lack of force or fear,[13] which included the presentation of expert testimony. Defendant successfully interposed objections, cross-examined prosecution witnesses, and presented evidence in his own defense. The trial court also granted defendant's request for advisory counsel for the limited purpose of investigating and presenting mental defenses, thereby manifesting its exercise of discretion in this matter. And finally, given defendant's unrelenting,

---

[13] Even if the latter defense, based upon a bank policy of acceding to the demands of apparently armed robbers, was entirely specious.

prodigious and effectual efforts to manipulate, obstruct, and prolong these proceedings, the court was justified in finding that further delays associated with appointment of advisory counsel were unjustified. (See *People v. Lawley, supra*, 27 Cal.4th 102, 149–151.) We conclude that the trial court did not err by declining to appoint advisory counsel for defendant. (*Id.* at p. 151; *People v. Clark, supra*, 3 Cal.4th 41, 111–112; *People v. Crandell, supra*, 46 Cal.3d 833, 863.)

IV. *The Refusal of the Trial Court to Appoint Counsel to Represent Defendant in the Bifurcated Trial on the Prior Conviction Allegations.*

Defendant also complains that he was denied the right to counsel to represent him in the bifurcated jury trial proceeding on the prior conviction allegations. Defendant moved for appointment of an attorney for trial on "the truth of the prior convictions" in the event of a guilty verdict. The court advised defendant that an attorney could be appointed to represent him for "the balance of the trial," which would include "the priors," but not for different aspects of the trial. The court then deferred the request "until such time as before the trial of the priors commences, if that's going to commence." Defendant was invited to "address" the court "at that time." After the jury verdict, defendant did not renew his request or otherwise move again for appointment of counsel for the trial of the prior conviction allegations, but rather continued to represent himself. He now claims that the "bifurcated trial on the priors was a critical stage" of the proceedings, and he was entitled to counsel upon request. We disagree.

"A trial judge is not obligated to restore counsel if a *Faretta* defendant changes his mind in midtrial and no longer wants to represent himself. A request for restoration of the services of counsel is left to the sound discretion of the trial court, exercised in light of several factors, including: ' "(1) defendant's prior history in the substitution of counsel and the desire to change from self-representation to counsel-representation, (2) the reasons set forth for the request, (3) the length and stage of the trial proceedings, (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion, and (5) the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney." ' [Citation.]" (*Brookner v. Superior Court* (1998) 64 Cal.App.4th 1390, 1394 [76 Cal.Rptr.2d 68]; see also *People v. Lawley, supra*, 27 Cal.4th 102, 149.)

Here, prior to commencement of trial defendant requested appointment of counsel only for proceedings related to the separate trial on "the truth of the prior convictions." The trial court was justified in deferring a ruling on the request until "such time" as a "trial on the priors" became necessary, as that

proceeding was entirely contingent upon the prosecution obtaining guilty verdicts on the charged offenses. We find no abuse of discretion in the trial court's failure to grant to defendant at that stage of the proceedings a restoration of counsel for future proceedings which might never occur. Following the trial and jury verdict, defendant had the obligation and opportunity to renew the motion and obtain a ruling if he still desired to relinquish responsibility for his own defense and obtain the appointment of counsel to represent him for the remainder of the action. (See *People v. Thompson* (1990) 221 Cal.App.3d 923, 931–932 [270 Cal.Rptr. 863]; see also *People v. Hallman* (1989) 215 Cal.App.3d 1330, 1340 [264 Cal.Rptr. 215].) He did not do so. Without a renewal of the motion by defendant the trial court was not compelled to appoint an attorney. We conclude that the record fails to establish a miscarriage of justice or violation of defendant's constitutional right to appointed counsel. (*People v. Lawley, supra,* 27 Cal.4th 102, 151.)

## V. *The Denial of Defendant's Severance Motion.*

Defendant next claims that the trial court erroneously denied his motion for severance of counts 5 and 6 from the remaining charges. He acknowledges that section 954 authorized joinder of all of the robbery charges, but claims that severance of counts 5 and 6 was appropriate and necessary to prevent the "use of evidence which otherwise was not cross-admissible" in the case for the "improper purpose" of establishing a "pattern of behavior" or disposition to commit the crimes in violation of Evidence Code section 1101, subdivision (a). He adds that the failure to sever trial of the charges resulted in an improper joint trial of a relatively "weak" case—count 5—with the other counts that offered comparatively more convincing identification testimony. Defendant further argues that even if the denial of the pretrial severance motion was correct, the joint trial of all the charges "actually resulted in 'gross unfairness,' amounting to a denial of due process," and thus the convictions "must be reversed."

Section 954 states in part that an "accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." All of the charged crimes were the "same class" of robbery offenses, so under section 954 joinder was proper unless "a clear showing of prejudice" was made. (*People v. Koontz, supra,* 27 Cal.4th 1041, 1075; see *People v. Jenkins* (2000) 22 Cal.4th 900, 947 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) Section 1098

directs that, "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials. . . ." The statutes evince a legislative preference for joint trials. (*People v. Boyde* (1988) 46 Cal.3d 212, 231–232 [250 Cal.Rptr. 83, 758 P.2d 25]; *People v. Greenberger* (1997) 58 Cal.App.4th 298, 343 [68 Cal.Rptr.2d 61].)

"When, as here, the statutory requirements for joinder are met, a defendant must make a clear showing of prejudice to establish that the trial court abused its discretion in denying the defendant's severance motion." (*People v. Mendoza* (2000) 24 Cal.4th 130, 160 [99 Cal.Rptr.2d 485, 6 P.3d 150].) " ' " 'The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' [Citation.] . . ." ' [Citation.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1120 [124 Cal.Rptr.2d 373, 52 P.3d 572].) "We review the trial court's ruling for abuse of discretion, which will be found 'when the trial court's ruling " 'falls outside the bounds of reason.' " ' [Citation.]" (*People v. Jenkins, supra*, 22 Cal.4th 900, 947.) "In determining whether there was an abuse of discretion, we examine the record before the trial court at the time of its ruling." (*People v. Mendoza, supra*, at p. 161.) " ' "The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial." [Citation.] . . .' [Citations.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315 [65 Cal.Rptr.2d 145, 939 P.2d 259].) "The factors to be considered are these: (1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case." (*People v. Mendoza, supra*, at p. 161; see also *People v. Gutierrez, supra*, at p. 1120.)

Although we agree with defendant that count 5 presented a slightly weaker case of identification than the remaining charges, we find no error in the trial court's failure to order separate trials. Our " 'first step in assessing whether a combined trial [would have been] prejudicial is to determine whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others. If so, any inference of prejudice is dispelled.' [Citations.] Cross-admissibility suffices to negate prejudice, but it is not essential for that purpose." (*People v. Bradford, supra*, 15 Cal.4th 1229, 1315–1316.) Our high court has declared that although " ' "we have held that cross-admissibility ordinarily dispels any

inference of prejudice, we have never held that the absence of cross-admissibility, by itself, sufficed to demonstrate prejudice." ' [Citation.]" (*Id.* at p. 1316.)

■ We find that the evidence would have been cross-admissible to show a common scheme or plan in separate trials. "Evidence Code section 1101, subdivision (a) establishes a general rule that, subject to various exceptions, character evidence is inadmissible to prove a party's conduct on a specific occasion. One of the exceptions, set forth in Evidence Code section 1101, subdivision (b), permits the admission of evidence that a person committed specific acts of conduct 'when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity . . .) other than his or her disposition to commit such an act.' " (*People v. Diaz* (1992) 3 Cal.4th 495, 561 [11 Cal.Rptr.2d 353, 834 P.2d 1171]; see also *People v. Catlin* (2001) 26 Cal.4th 81, 111 [109 Cal.Rptr.2d 31, 26 P.3d 357]; *People v. Branch* (2001) 91 Cal.App.4th 274, 280 [109 Cal.Rptr.2d 870]; *People v. Van Winkle* (1999) 75 Cal.App.4th 133, 140 [89 Cal.Rptr.2d 28].) " 'The presence of a design or plan to do or not to do a given act has probative value to show that the act was in fact done or not done.' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 [27 Cal.Rptr.2d 646, 867 P.2d 757].) "[D]espite the prohibition against admitting evidence of an uncharged crime to demonstrate a defendant's criminal propensity, such evidence is admissible to show identity or the existence of a common scheme or plan. [Citation.] This type of evidence, when offered on the issue of identity, 'must be highly similar to the charged offenses.' [Citation.] Evidence tending to establish a common plan or design should demonstrate ' "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." ' [Citation.]" (*People v. Catlin, supra,* at p. 120.) However, "Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense." (*People v. Ewoldt, supra,* at p. 403.) "For this purpose, 'the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 371 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)

In the present case, all of the robbery offenses bore a number of distinctive common marks. The robber entered the banks in the late afternoon shortly before scheduled closing times. He stood in line or approached the teller windows as would any bank customer. He then handed the tellers notes that bore essentially the same message: I have a gun; give me your money or large bills. If the tellers did not immediately respond, the robber ordered them to comply. Many of the tellers were warned not to hit the alarm. And

finally, the descriptions of the perpetrator by the victims of all of the robberies were quite similar. (*People v. Catlin, supra*, 26 Cal.4th 81, 120.) The evidence of the offenses other than count 5 had solid probative value to establish a common plan or scheme on defendant's part to commit a series of bank robberies. (See *People v. Branch, supra*, 91 Cal.App.4th 274, 281.)

■ We further find that the evidence was not subject to exclusion under Evidence Code section 352, which " 'provides in part that the court may in its discretion exclude evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice." ' [Citation.]" (*People v. Roybal* (1998) 19 Cal.4th 481, 516 [79 Cal.Rptr.2d 487, 966 P.2d 521].) " 'Because evidence of other crimes may be highly inflammatory, its admissibility should be scrutinized with great care. [Citation.]' [Citation.]" (*People v. Medina* (1995) 11 Cal.4th 694, 748 [47 Cal.Rptr.2d 165, 906 P.2d 2].) The following relevant factors must be considered in determining whether the prejudicial effect of evidence of uncharged offenses outweighs its probative value: (1) whether the inference created by the evidence is strong; (2) whether the source of evidence concerning the present offense is independent of and unaffected by information about the uncharged offense; (3) whether the defendant was punished for the prior misconduct; (4) whether the uncharged offense is more inflammatory than the charged offense; and (5) whether the two incidents occurred close in time. (*People v. Ewoldt, supra*, 7 Cal.4th 380, 404–405.)

None of the robbery offenses were more inflammatory than the others, and the evidence was, as we have observed, quite probative on the issue of common plan or scheme. Hence, the evidence was not unduly prejudicial under section 352. " ' "The 'prejudice' referred to in . . . section 352 applies to evidence which uniquely tends to evoke an emotional bias against . . . [one party] as an individual and which has very little effect on the issues." ' [Citations.]" (*People v. Garceau* (1993) 6 Cal.4th 140, 178 [24 Cal.Rptr.2d 664, 862 P.2d 664]; see also *People v. Garcia* (1995) 41 Cal.App.4th 1832, 1850 [50 Cal.Rptr.2d 127].) The source of the evidence on each robbery charge was also unrelated to any of the other robberies. Further, the acts occurred very close in time, within a 10-week period. And finally, defendant did not present antagonistic or even distinctive defenses to the charges. (*People v. Jackson, supra*, 13 Cal.4th 1164, 1208–1209; *People v. Pinholster* (1992) 1 Cal.4th 865, 934 [4 Cal.Rptr.2d 765, 824 P.2d 571].) He essentially claimed that for all of the charges the identification testimony offered against him was unpersuasive. We therefore conclude that all of the evidence would have been cross-admissible in separate trials, so the trial court's failure to grant severance was not error. (*People v. Koontz, supra*, 27 Cal.4th 1041, 1075.)

## VI. *The Denial of Defendant's Motion for a Pretrial Lineup.*

We turn to defendant's contention that he was "deprived of due process and a fair trial by the court's erroneous denial of his motion for a pretrial *Evans* lineup." The trial court denied the motion on grounds that it was untimely and unsupported by the requisite showing of a probability of mistaken identification. Defendant argues that his motions were timely made and supported by "many factors pointing to a probability of a faulty identification" of him as the robber. He submits that the trial court's failure to grant his motion for a pretrial lineup was "outlandish," and "compels reversal."

"In *Evans v. Superior Court* (1974) 11 Cal.3d 617, 625 [114 Cal.Rptr. 121, 522 P.2d 681]," the California Supreme Court "concluded that 'due process requires in an appropriate case that an accused, upon timely request therefor, be afforded a pretrial lineup in which witnesses to the alleged criminal conduct can participate. The right to a lineup arises, however, only when eyewitness identification is shown to be a material issue and there exists a reasonable likelihood of a mistaken identification which a lineup would tend to resolve.' (Fn. omitted.)" (*People v. Farnam* (2002) 28 Cal.4th 107, 183 [121 Cal.Rptr.2d 106, 47 P.3d 988]; see also *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1155 [36 Cal.Rptr.2d 235, 885 P.2d 1].) The "questions whether eyewitness identification is a material issue and whether fundamental fairness requires a lineup in a particular case are inquiries which necessarily rest for determination within the broad discretion of the magistrate or trial judge." (*Evans, supra,* at p. 625.)

Without considering the timeliness of defendant's motion in superior court, we conclude that he failed to make the prima facie showing required by *Evans.* Upon our review of the record we find no "reasonable likelihood of a mistaken identification" that would have been resolved by a pretrial lineup. First, witnesses to the robbery at Citibank positively identified defendant in the field after he was apprehended near the crime scene in a taxi—the same one that brought him to the bank—in possession of the money and demand note, along with a sweater that matched the one worn by the robber. Another Citibank employee identified defendant from a photo lineup and at trial as "the person who robbed the bank." The witnesses identified photographs of the robber taken by bank surveillance cameras, which were exhibited to the jury. The descriptions of the robber provided by the witnesses, although not identical, were fairly uniform and corresponded to defendant's appearance. Most of the witnesses managed to get a good look at the face of the robber during the crimes. Many, although not all, of the witnesses identified defendant from the photo lineups displayed to them, and defendant has not established that those photo lineups were in any way impermissibly suggestive. Defendant was provided with the statements and descriptions of the

witnesses, along with all of the information associated with the photo lineups. He thus had ample opportunity to challenge the identifications at trial, even without a pretrial physical lineup. We are convinced that an additional pretrial lineup would not have yielded any different testimony by the witnesses, or cast doubt upon any of the identifications made by them. Therefore, we find no abuse of discretion in the trial court's denial of defendant's motion for a lineup. (*People v. Williams* (1997) 16 Cal.4th 153, 235–236 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

VII. *The Instruction on Eyewitness Identification Factors.*

Defendant presents two objections to the jury instructions, the first of which is that the trial court erred by failing to delete sua sponte the reference to witness "certainty" from the standard instruction (CALJIC No. 2.92) on the factors to be considered in "determining the weight to be given eyewitness testimony."[14] Defendant complains that the expert opinion testimony presented by Dr. Blinder discredited the certainty expressed by the witnesses as a legitimate factor bearing on the accuracy of an identification. He claims that CALJIC No. 2.92 as given by the trial court with the "use of the 'certainty' factor" thus violated his "right to due process, because it reinforced a pervasive misconception and lightened the prosecution's burden of proof."

For two reasons, we find no merit to defendant's challenge to CALJIC No. 2.92 as given by the trial court. First, the trial court had no duty to either give or modify CALJIC No. 2.92 on its own motion. (See *People v. Cook* (2006) 39 Cal.4th 566, 599 [47 Cal.Rptr.3d 22, 139 P.3d 492]; *People v. Ward* (2005) 36 Cal.4th 186, 213–214 [30 Cal.Rptr.3d 464, 114 P.3d 717]; *People v. Alcala* (1992) 4 Cal.4th 742, 802–803 [15 Cal.Rptr.2d 432, 842 P.2d 1192].) Second, although the California Supreme Court, like defendant's expert, has referred to studies that indicate a lack of correlation between the degree of confidence an eyewitness expresses in an identification and the accuracy of that identification,[15] this court in *People v. Gaglione* (1994) 26 Cal.App.4th 1291, 1302–1303 [32 Cal.Rptr.2d 169],[16] observed that defendant's argument was "expressly rejected" in *People v. Wright* (1988) 45 Cal.3d 1126 [248 Cal.Rptr. 600, 755 P.2d 1049]. In *Wright, supra,* at page 1141, the court held that "a proper instruction on eyewitness identification factors

---

[14] The instruction advised the jury to consider, among other enumerated factors, "The extent to which the witness is either certain or uncertain of the identification."

[15] See *People v. McDonald* (1984) 37 Cal.3d 351, 369 [208 Cal.Rptr. 236, 690 P.2d 709].

[16] In *People v. Gaglione, supra,* 26 Cal.App.4th 1291, 1302, the defendant argued, as does defendant here, that "CALJIC No. 2.92 was inadequate" in that it informed "the jurors to consider the witness's certainty of identification, thereby leading the jurors to believe that the more certain the witness is the more likely the identification is correct."

should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification; by listing, in a neutral manner, the relevant factors supported by the evidence. [¶] The instruction should not take a position as to the impact of each of the psychological factors listed." (Italics omitted.) In *Gaglione*, we noted that the *Wright* opinion "expressly approved CALJIC No. 2.92, commenting that CALJIC No. 2.92, with appropriate modifications to take into account the evidence presented at trial, will usually provide sufficient guidance on eyewitness identification factors. ([*Wright, supra,*] 45 Cal.3d at p. 1141.)" (*People v. Gaglione, supra*, at p. 1303; see also *People v. Johnson* (1992) 3 Cal.4th 1183, 1230–1231 [14 Cal.Rptr.2d 702, 842 P.2d 1].) As in *Gaglione*, we therefore "reject defendant's arguments and find no error in CALJIC No. 2.92" as given with reference to degree of certainty as a factor in assessing the reliability of eyewitness identification testimony. (*Gaglione, supra*, at p. 1303.)

## VIII. The Instruction on the Lesser Offense of Grand Theft.

Defendant also argues that his due process and jury trial rights were denied by the trial court's instruction, over his objection, on the lesser included offense of grand theft. His position is that the "better rule in American jurisprudence" is to grant to "the defendant" the "ultimate decision to instruct on a lesser-included offense." (See *People v. Brocksmith* (1992) 237 Ill.App.3d 818 [178 Ill.Dec. 536, 604 N.E.2d 1059].) The "peril" of conviction of the greater offense is entirely on the defendant, he submits, so the decision to request or preclude a lesser included offense instruction should also be the defendant's alone. Defendant adds that without an instruction on the lesser grand theft offense, he would not have been convicted of the robberies if the jury had accepted his defense of lack of "force or fear" associated with the takings from the bank tellers.

The glaring flaw in defendant's argument is that it runs directly contrary to established California Supreme Court authority. (*People v. Breverman* (1998) 19 Cal.4th 142, 154–155 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) " ' "The trial court has a sua sponte duty to instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of such a lesser offense." ' [Citation.] As we have explained, instructing on lesser included offenses shown by the evidence avoids forcing the jury into an 'unwarranted all-or-nothing choice' [citations] that could lead to an unwarranted conviction." (*People v. Hughes* (2002) 27 Cal.4th 287, 365 [116 Cal.Rptr.2d 401, 39 P.3d 432].) " ' "That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were

present . . . ." ' [Citation.] '[R]egardless of the tactics or objections of the parties, or the relative strength of the evidence on alternate offenses or theories, the rule requires sua sponte instruction on any and all lesser included offenses, or theories thereof, which are supported by the evidence.' [Citation.]" (*People v. Ochoa* (1998) 19 Cal.4th 353, 422 [79 Cal.Rptr.2d 408, 966 P.2d 442].) Thus, "The obligation to instruct on lesser included offenses exists even when, as a matter of trial tactics, a defendant not only fails to request the instruction but also expressly objects to it being given." (*People v. Joiner* (2000) 84 Cal.App.4th 946, 972 [101 Cal.Rptr.2d 270].)

Our high court has "consistently held that neither party need request such instructions, and neither party can preclude them, because neither party has a greater interest than the other in gambling on an inaccurate all-or-nothing verdict when the pleadings and evidence suggest a middle ground, and neither party's 'strategy, ignorance, or mistake[]' should open the way to such a verdict. [Citations.] Our courts, we have stressed, ' "are not gambling halls but forums for the discovery of truth." ' [Citations.]" (*People v. Birks* (1998) 19 Cal.4th 108, 127 [77 Cal.Rptr.2d 848, 960 P.2d 1073], italics omitted.) Despite defendant's entreaty that we avoid "blind adherence to precedent," until our Supreme Court rules otherwise we are compelled to follow the decision in *Breverman,* and find no instructional error.[17] (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]; *People v. Scott* (2000) 85 Cal.App.4th 905, 915–916 [102 Cal.Rptr.2d 622]; *People v. Eastman* (1993) 13 Cal.App.4th 668, 674 [16 Cal.Rptr.2d 608].)

## IX. *The Evidence to Support the Conviction on Count 5.*

We proceed to defendant's claim that the "conviction on count five must be set aside because it is based upon legally insufficient evidence that he participated in that crime." Defendant's argument is based primarily upon the lack of a definitive identification by the victim, Nicole Lopez, the teller at the Bank of America branch in Antioch.

"Defendant's claim of insufficient evidence requires us to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Frye* (1998) 18 Cal.4th 894, 953 [77 Cal.Rptr.2d 25, 959 P.2d 183].) " 'We examine the record to determine "whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] . . .' [Citations.]" (*People v. Moon* (2005) 37

---

[17] Having found no errors were committed before or during trial, we need not address defendant's contention that the cumulative impact of the errors was prejudicial to him.

Cal.4th 1, 22 [32 Cal.Rptr.3d 894, 117 P.3d 591].) " 'In making this determination, the appellate court " 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' . . . 'Our task . . . is twofold. First, we must resolve the issue in the light of the whole record . . . . Second, we must judge whether the evidence . . . is substantial . . . .' " ' [Citation.]" (*People v. Proby* (1998) 60 Cal.App.4th 922, 928 [70 Cal.Rptr.2d 706], italics omitted.) "Where, as here, the jury's findings rest to some degree upon circumstantial evidence, we must decide whether the circumstances reasonably justify those findings, 'but our opinion that the circumstances also might reasonably be reconciled with a contrary finding' does not render the evidence insubstantial. [Citation.]" (*People v. Earp* (1999) 20 Cal.4th 826, 887–888 [85 Cal.Rptr.2d 857, 978 P.2d 15].) Further, if the record contains substantial evidence from which a reasonable trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt "the possibility that the trier of fact might reasonably have reached a different conclusion does not warrant reversal." (*People v. Taylor* (2004) 119 Cal.App.4th 628, 639 [14 Cal.Rptr.3d 550].)

Despite the failure of the victim to positively identify defendant at trial or in a pretrial photo lineup, we find substantial evidence to support the count 5 robbery conviction. Lopez may not have been "sure" of her identification at trial, but she testified that defendant "appear[ed] to be" the robber. She gave a description of the robber to the police that fairly well matched defendant's appearance, and testified that a photograph taken by the Bank of America security camera depicted the man who robbed her. Lopez also identified the subject in a World Savings Bank surveillance camera photograph as the person who robbed her, and defendant was positively identified by eyewitnesses as the man who robbed the teller at the World Savings Bank robbery in Concord. Finally, the perpetrator of the robbery at Bank of America used methods and committed acts that were essentially identical to the other robberies committed by a man positively identified as defendant. The descriptions of the robber given by all of the witnesses, including Lopez, were also similar. The evidence to support the conviction on count 5 may not have been as overwhelming as it was on the other charges, but it was at least substantial.

## X. *The Imposition of Consecutive Sentences*

Defendant also presents two issues related to the imposition of the sentence imposed upon him of six consecutive 25-year-to-life terms under the Three Strikes law, each enhanced by 10 years for two prior serious felony convictions (§ 667, subd. (a)) found by the trial court, for a total term of 210 years to life. He first claims that the "consecutive sentencing violated the Due

Process Clause of the Fourteenth Amendment and the Sixth Amendment to the United States Constitution, because no jury determined beyond a reasonable doubt (or at all) that the government had proven the facts necessary to permit the judge to impose consecutive sentences," as required by *Blakely v. Washington* (2004) 542 U.S. 296, 301 [159 L.Ed.2d 403, 124 S.Ct. 2531] (*Blakely*), and *United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738] (*Booker*).

In *Blakely*, the United States Supreme Court revisited the rule articulated in *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*), that " '[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' " (*Blakely, supra*, 542 U.S. 296, 301.) The court found that an exceptional sentence beyond the standard range sentence for the offense imposed by a trial judge under Washington's determinate sentencing law based upon several specified facts found by the trial judge violated the *Apprendi* rule that the jury verdict alone must "authorize the sentence." (*Id.* at p. 305, fn. 8; see also *People v. Riskin* (2006) 143 Cal.App.4th 234, 241 [49 Cal.Rptr.3d 287]; *People v. Linder* (2006) 139 Cal.App.4th 75, 83–84 [42 Cal.Rptr.3d 496].) The court in *Blakely* operated from the premise pronounced in both its *Apprendi* and *Ring* decisions that a defendant's constitutional rights have been violated when a judge imposes "a sentence greater than the maximum he could have imposed under state law without the challenged factual finding." (*Blakely, supra*, at p. 303, citing *Apprendi, supra*, at pp. 491–497, and *Ring v. Arizona* (2002) 536 U.S. 584, 603–609 [153 L.Ed.2d 556, 122 S.Ct. 2428].) The court defined "the 'statutory maximum' for *Apprendi* purposes" as "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* [Citations.] In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' [citation], and the judge exceeds his proper authority." (*Blakely, supra*, at pp. 303–304.)

The United States Supreme Court provided additional guidance on the distinction between permissible and impermissible judicial factfinding in *Booker, supra*, 543 U.S. 220, where the defendant received a term under the federal sentencing guidelines that exceeded the base range following the trial judge's finding by a preponderance of the evidence that he possessed an amount of drugs in excess of that determined by the jury's verdict. In *Booker*, a majority of the court "found no significant distinction between the mandatory federal sentencing guidelines and the Washington sentencing law at issue

in *Blakely* and concluded the federal guidelines [also] violated the Sixth Amendment. (*Booker, supra*, at p. 233 [160 L.Ed.2d at p. 643].)" (*People v. Linder, supra*, 139 Cal.App.4th 75, 83.) The high court in *Booker* concluded that the federal guidelines violated the Sixth Amendment because "the relevant sentencing rules are mandatory and impose binding requirements on all sentencing judges." (*Booker, supra*, at p. 233.)

The court in *Booker* acknowledged that if the guidelines had been "merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range." (*Booker, supra*, 543 U.S. 220, 233.) But the majority in *Booker* also pointed out that the federal sentencing statute requires the judge to impose a sentence within the range established by the guidelines, "subject to departures in specific, limited cases." (*Id.* at p. 234; see 18 U.S.C. § 3553(a).) "Thus, just as in *Blakely*," the court declared, " 'the jury's verdict alone does not authorize the sentence. The judge acquires that authority only upon finding some additional fact.' " (*Booker, supra*, at p. 235, quoting *Blakely, supra*, 542 U.S. 296, 305.)

The California determinate sentencing law (DSL) was temporarily spared from the reach of *Blakely* and *Booker* by the decision in *People v. Black* (2005) 35 Cal.4th 1238 [29 Cal.Rptr.3d 740, 113 P.3d 534] (*Black*), where the California Supreme Court decided that a "defendant's constitutional right to a jury trial" is "not violated by the trial court's imposition of the upper term sentence" for a conviction "or by its imposition of consecutive sentences" upon two or more convictions. (*Id.* at p. 1264.) After defendant submitted his opening brief, however, the United States Supreme Court reversed the *Black* decision in *Cunningham v. California* (2007) 549 U.S. 270, ___ [166 L.Ed.2d 856, 865, 127 S.Ct. 856, 860] (*Cunningham*), where the defendant was "tried and convicted of continuous sexual abuse of a child under the age of 14[, which under the DSL is] . . . punishable by imprisonment for a lower term sentence of 6 years, a middle term sentence of 12 years, or an upper term sentence of 16 years. Cal. Penal Code Ann. § 288.5(a)." (*Cunningham, supra*, 549 U.S. at p. ___ [166 L.Ed.2d at p. 865].) At the sentencing hearing the trial court found six aggravating circumstances, all related to commission of the offense—as the defendant had no prior record of criminal conduct—and on that basis imposed the upper term. The court observed that "the DSL regime is implemented in the following manner. The statute defining the offense prescribes three precise terms of imprisonment—a lower, middle, and upper term sentence. *E.g.*, Penal Code § 288.5(a) (West 1999) (a person convicted of continuous sexual abuse of a child 'shall be punished by imprisonment in the state prison for a term of 6, 12, or 16 years'). See also *Black*, 35 Cal.4th [1238,] 1247[, 29 Cal.Rptr.3d 740, 113 P.3d, 534, 538]. Penal Code § 1170(b)

(West Supp. 2006) controls the trial judge's choice; it provides that 'the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime.' '[C]ircumstances in aggravation or mitigation' are to be determined by the court after consideration of several items: the trial record; the probation officer's report; statements in aggravation or mitigation submitted by the parties, the victim, or the victim's family; 'and any further evidence introduced at the sentencing hearing.' [Citation.]" (*Cunningham, supra,* 549 U.S. at p. ___ [166 L.Ed.2d at p. 866].) "Under California's DSL, an upper term sentence may be imposed only when the trial judge finds an aggravating circumstance." (*Id.* at p. ___ [166 L.Ed.2d at p. 873].) "An element of the charged offense, essential to a jury's determination of guilt, or admitted in a defendant's guilty plea, does not qualify as such a circumstance." (*Id.* at p. ___ [166 L.Ed.2d at p. 873].) "Instead, aggravating circumstances depend on facts found discretely and solely by the judge." (*Id.* at p. ___ [166 L.Ed.2d at p. 873].)

The court in *Cunningham* concluded: "In accord with *Blakely,* therefore, the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum. [*Blakely, supra,*] 542 U.S. 296, 303 ('[T]he "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant . . .*' (emphasis in original)). Because circumstances in aggravation are found by the judge, not the jury, and need only be established by a preponderance of the evidence, not beyond a reasonable doubt, [citation], the DSL violates *Apprendi*'s bright-line rule: Except for a prior conviction, 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' [*Apprendi, supra,* 530 U.S. 466, 490.]" (*Cunningham, supra,* 549 U.S. at p. ___ [166 L.Ed.2d at p. 873].) The court summarized: "Contrary to the *Black* court's holding, our decisions from *Apprendi* to *Booker* point to the middle term specified in California's statutes, not the upper term, as the relevant statutory maximum. Because the DSL authorizes the judge, not the jury, to find the facts permitting an upper term sentence, the system cannot withstand measurement against our Sixth Amendment precedent." (*Cunningham, supra,* 549 U.S. at p. ___ [166 L.Ed.2d at p. 876]; see also *People v. Brown* (2007) 148 Cal.App.4th 911, 917 [56 Cal.Rptr.3d 255].)

Nothing in *Cunningham* casts constitutional doubt upon the imposition of consecutive sentences by the trial court in the present case. The consecutive terms were not selected by the trial court on the basis of any findings, but rather, following the jury verdict, were mandatory pursuant to section 1170.12, subdivision (a)(6), which provides: "If there is a current conviction for more than one felony count not committed on the same occasion, and not arising from the same set of operative facts, the court shall sentence the defendant

consecutively on each count pursuant to this section."[18] The jury, not the trial court, found the predicate facts required to authorize the mandatory consecutive sentences for multiple robberies committed at separate times and places, upon separate victims. The jury verdicts specified that defendant committed six robberies upon different victims, at different locations, on different dates. Once the jury verdict was rendered, the sentencing court was compelled to sentence defendant consecutively. (*People v. Hendrix* (1997) 16 Cal.4th 508, 513 [66 Cal.Rptr.2d 431, 941 P.2d 64].) Imposition of mandatory consecutive sentences which were authorized by facts reflected in the jury verdict alone, without the necessity of any additional supporting facts found by the trial court, did not offend the federal Constitution guarantees afforded to a criminal defendant to a jury determination, based on proof beyond a reasonable doubt, of every element of the crime and every fact, however labeled, that increases the defendant's punishment beyond the prescribed statutory maximum. We therefore conclude that defendant was not denied his due process rights to a jury trial and finding of guilt beyond a reasonable doubt under *Blakely* by the trial court's imposition of consecutive terms. (See *People v. Shaw* (2004) 122 Cal.App.4th 453, 459 [18 Cal.Rptr.3d 766].)

## XI. *Defendant's Aggregate Sentence as Cruel and Unusual Punishment*

■ Finally, we confront defendant's claim that his "aggregate sentence of 210 years to life violates the proscription against cruel and/or unusual punishment under both the California and United States Constitutions." Defendant complains that the sentence, "besides being ridiculous and absurd in the extreme as a matter of reality," is also "grossly disproportionate, by any conceivably rational measure. Indeed, it is in excess of what he would have received had he murdered, rather than robbed, his victims." He asks us to vacate his sentence and remand the case for resentencing "to an appropriate term which does not violate the constitutional prohibition against cruel and unusual punishment."

"Cruel and unusual punishment is prohibited by the Eighth Amendment of the United States Constitution and article I, section 17 of the California Constitution. Punishment is cruel and unusual if it is so disproportionate to the crime committed that it shocks the conscience and offends fundamental notions of human dignity." (*People v. Mantanez* (2002) 98 Cal.App.4th 354,

---

[18] Section 667, subdivision (c)(6), also provides: "If there is a current conviction for more than one felony count not committed on the same occasion, and not arising from the same set of operative facts, the court shall sentence the defendant consecutively on each count pursuant to subdivision (e)." Under section 667, subdivision (c)(6), " 'consecutive sentencing is mandatory for any current felony convictions "not committed on the same occasion, and not arising from the same set of operative facts." ' [Citation.]" (*People v. Deloza* (1998) 18 Cal.4th 585, 590–591 [76 Cal.Rptr.2d 255, 957 P.2d 945].)

358 [119 Cal.Rptr.2d 756], fns. omitted.) " 'A tripartite test has been established to determine whether a penalty offends the prohibition against cruel . . . [or] unusual punishment. First, courts examine the nature of the offense and the offender, "with particular regard to the degree of danger both present to society." Second, a comparison is made of the challenged penalty with those imposed in the same jurisdiction for more serious crimes. Third, the challenged penalty is compared with those imposed for the same offense in other jurisdictions. [Citations.] In undertaking this three-part analysis, we consider the "totality of the circumstances" surrounding the commission of the offense. [Citations.]' [Citation.]" (*People v. Chacon* (1995) 37 Cal.App.4th 52, 63 [43 Cal.Rptr.2d 434]; see also *People v. Thongvilay* (1998) 62 Cal.App.4th 71, 87–88 [72 Cal.Rptr.2d 738].)

" 'Whether a particular punishment is disproportionate to the offense is, of course, a question of degree. The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible. The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty "out of all proportion to the offense" [citations], i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment.' [Citation.] 'Defining crime and determining punishment are matters uniquely legislative in nature, resting within the Legislature's sole discretion.' [Citation.]" (*People v. Lewis* (1993) 21 Cal.App.4th 243, 251 [25 Cal.Rptr.2d 827].) " 'Only when the punishment is out of all proportion to the offense and is clearly an extraordinary penalty for a crime of ordinary gravity committed under ordinary circumstances, do the courts denounce it as unusual.' [Citation.]" (*Ibid.*)

"Our Supreme Court has emphasized 'the considerable burden a defendant must overcome in challenging a penalty as cruel or unusual. The doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature. Perhaps foremost among these are the definition of crime and the determination of punishment. While these intrinsically legislative functions are circumscribed by the constitutional limits of article I, section 17 [of the California Constitution], the validity of enactments will not be questioned "unless their unconstitutionality clearly, positively, and unmistakably appears." ' [Citation.]" (*People v. Kinsey* (1995) 40 Cal.App.4th 1621, 1630 [47 Cal.Rptr.2d 769].) "Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496 [90 Cal.Rptr.2d 517]; see also *People v. Mantanez, supra*, 98 Cal.App.4th 354, 358.)

We find that defendant's sentence does not offend the proscription against cruel and unusual punishment under the governing standards. Commission of a series of robberies which included threatened acts of violence with a deadly weapon must be considered acts of a most heinous nature. (See *People v. Crooks* (1997) 55 Cal.App.4th 797, 807–808 [64 Cal.Rptr.2d 236].) He committed the robbery offenses one after another unabated until he was captured after the robbery at Concord Citibank.

A consideration of defendant's nature as an offender is no more favorable to him. "[T]he inquiry focuses on the particular person before the court, and asks whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*People v. Thompson* (1994) 24 Cal.App.4th 299, 305 [29 Cal.Rptr.2d 847].) Defendant has an extensive criminal history of serious felony offenses dating back many years. He already served two terms in state prison, and committed the present offenses while on escape status. He is an incorrigible recidivist offender who presents a most grave and extreme level of danger to society. Defendant qualifies as "precisely the type of offender from whom society seeks protection by the use of recidivist statutes." (*People v. Ingram* (1995) 40 Cal.App.4th 1397, 1415 [48 Cal.Rptr.2d 256].) His unrelenting criminality and current offenses validate the term imposed under the Three Strikes law. (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1512 [84 Cal.Rptr.2d 638]; *People v. Cline* (1998) 60 Cal.App.4th 1327, 1338 [71 Cal.Rptr.2d 41]; *People v. Goodwin* (1997) 59 Cal.App.4th 1084, 1094 [69 Cal.Rptr.2d 576]; *People v. Ingram, supra*, at pp. 1414–1416; *People v. Cooper* (1996) 43 Cal.App.4th 815, 825–826 [51 Cal.Rptr.2d 106]; *People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1136 [46 Cal.Rptr.2d 351].) "Recidivism in the commission of multiple felonies poses a manifest danger to society justifying the imposition of longer sentences for subsequent offenses." (*People v. Ayon* (1996) 46 Cal.App.4th 385, 399 [53 Cal.Rptr.2d 853].)

Defendant has also failed to establish with any factual support that his sentence is excessively harsh in comparison to the punishment for more serious crimes in this state. The "second prong of the *Lynch*[19] test which involves a comparison of the questioned punishment with punishments imposed within the same jurisdiction for offenses which may be deemed more serious than that for which the questioned punishment is imposed. While such a comparison is particularly striking when a more serious crime is punished less severely than the offense in question, it remains instructive when the latter is punished as severely as a more serious crime." (*People v. Thompson, supra*, 24 Cal.App.4th 299, 306; see also *People v. Cline, supra*, 60

---

[19] *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921].

Cal.App.4th 1327, 1338.) Defendant maintains that his sentence "is in excess of what he would have received had he murdered, rather than robbed, his victims."

Defendant's proffered comparison between his punishment and that imposed upon convicted first degree murderers is flawed for several reasons. First, the punishment for first degree murder may indeed be greater than defendant received. Pursuant to section 190, subdivision (a), "a person convicted of first degree murder is subject to the death penalty, life in prison without the possibility of parole, or a term of 25 years to life depending on the circumstances of the offense and the offender." (*People v. Cooper, supra,* 43 Cal.App.4th 815, 826; see also *People v. Ingram, supra,* 40 Cal.App.4th 1397, 1416.) Thus, the maximum punishment for the hypothecated crimes may be more severe than defendant received. (*People v. Cooper, supra,* at p. 826.)

"Second, proportionality assumes a basis for comparison. When the fundamental nature of the offense and the offender differ, comparison for proportionality is not possible." (*People v. Cooper, supra,* 43 Cal.App.4th 815, 826; see *People v. Ingram, supra,* 40 Cal.App.4th 1397, 1416.) Defendant "ignores that the three strikes law punishes not only his current offenses, but also his recidivism. California statutes imposing more severe punishment on habitual criminals have long withstood constitutional challenge." (*People v. Cartwright, supra,* 39 Cal.App.4th 1123, 1136–1137.) Defendant is not subject to multiple 25-year-to-life sentences merely on the basis of his current offenses alone, but also for his recidivist behavior. (*People v. Kinsey, supra,* 40 Cal.App.4th 1621, 1630.)

Thus, a comparison of defendant's "punishment for his current crimes with the punishment for other crimes in California is inapposite since it is his recidivism in combination with his current crimes that places him under the three strikes law." (*People v. Ayon, supra,* 46 Cal.App.4th 385, 400.) "Because the Legislature may constitutionally enact statutes imposing more severe punishment for habitual criminals," we cannot logically compare appellant's "punishment for his [current offenses,] which includes his recidivist behavior, to the punishment of others who have committed more serious crimes, but have not qualified as repeat felons. Other such offenders would likely receive similar or longer sentences under the new law if the law were applicable to them because of recidivist conduct." (*Ibid.,* fn. omitted.) "[I]t is proper to punish a repeat offender more severely than a first-time offender. The proper comparison would be to a recidivist killer," whose punishment would not be less severe than defendant's. (*People v. Martinez, supra,* 71 Cal.App.4th 1502, 1512.)

Further, the likelihood that he may not serve the entirety of the sentence does not, in our view, make the punishment inappropriate under the circumstances. "In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life. However, imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution (*People v. Young* (1992) 11 Cal.App.4th 1299, 1308–1311 [15 Cal.Rptr.2d 30]) or the federal Constitution. (*Harmelin v. Michigan* (1991) 501 U.S. 957 [111 S.Ct. 268, 115 L.Ed.2d 836] [sentence of life without possibility of parole not cruel and unusual for possession of 672 grams of cocaine].)" (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383 [108 Cal.Rptr.2d 243].)

Finally, appellant is not only a recidivist offender, he committed a *series* of current felonies. "[T]he commission of a single act of murder, while heinous and severely punished, cannot be compared with the commission of multiple felonies." (*People v. Cooper, supra*, 43 Cal.App.4th 815, 826; see *People v. Ingram, supra*, 40 Cal.App.4th 1397, 1416.) We find that defendant's sentence is not out of all proportion to the punishment in California for commission of multiple, serious robbery offenses by a recidivist offender. (See *People v. Goodwin, supra*, 59 Cal.App.4th 1084, 1094.)

■ Turning to an interjurisdictional comparison of punishments, defendant is required to prove that " '. . . the punishment prescribed for his offense, as compared to that imposed for similar offenses in other jurisdictions, is unconstitutional under the third prong of [the *Lynch-Dillon*[20] test].' [Citation.]" (*People v. Crooks, supra*, 55 Cal.App.4th 797, 808.) If the challenged penalty is found to exceed punishments within the constitutional limit of severity decreed for the offense in a "significant number" of jurisdictions, the disparity is considered "a further measure of its excessiveness." (*In re Lynch, supra*, 8 Cal.3d 410, 427.)

■ Defendant has not even attempted to engage in a comparison of California's punishment for recidivists with punishment for recidivists in other states. While the courts have acknowledged the status of the Three Strikes law as "among the most extreme" in the nation, that factor "does not compel the conclusion that it is unconstitutionally cruel or unusual." (*People v. Martinez, supra*, 71 Cal.App.4th 1502, 1516.) "California's Three Strikes scheme is consistent with the nationwide pattern of substantially increasing sentences for habitual offenders." (*People v. Ingram, supra*, 40 Cal.App.4th 1397, 1416.) After undertaking a methodical comparison of repeat or habitual offender punishment schemes in other states, the court in *People v. Martinez,*

---

[20] *In re Lynch, supra*, 8 Cal.3d 410; *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697].

*supra,* at page 1516, declared that California is not required "to march in lockstep with other states in fashioning a penal code. It does not require 'conforming our Penal Code to the "majority rule" or the least common denominator of penalties nationwide.' [Citation.] Otherwise, California could never take the toughest stance against repeat offenders or any other type of criminal conduct."[21] The court in *People v. Cooper, supra,* 43 Cal.App.4th 815, 827, explained: "[T]he needs and concerns of a particular state may induce it to treat certain crimes or particular repeat offenders more severely than any other state. Nothing in the prohibition against cruel or unusual punishment per se disables a state from responding to changed social conditions and increasing the severity with which it treats its recidivist felons. [¶] Whether a particular punishment is disproportionate to the offense is a question of degree. The choice of fitting and proper penalty is not an exact science but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will. In some cases, leeway for experimentation may be permissible. Thus, the judiciary should not interfere in the process unless a statute prescribes a penalty ' "out of all proportion to the offense." ' " (Quoting *In re Lynch, supra,* 8 Cal.3d 410, 423–424.)

"[A] comparison of California's punishment for recidivists with punishment for recidivists in other states shows that many of the statutory schemes provide for life imprisonment for repeat offenders, and several states provide for life imprisonment without possibility of parole." (*People v. Cline, supra,* 60 Cal.App.4th 1327, 1338.) We conclude, as have other courts when presented with essentially the same issue in similar contexts, that defendant has failed to establish his sentence is disproportionate when compared to recidivist statutes in other jurisdictions. (*People v. Martinez, supra,* 71 Cal.App.4th 1502, 1516; *People v. Cline, supra,* at p. 1338; *People v. Ayon, supra,* 46 Cal.App.4th 385, 400; *People v. Cooper, supra,* 43 Cal.App.4th 815, 826–828; *People v. Ingram, supra,* 40 Cal.App.4th 1397, 1416.) We conclude that imposition of a sentence upon defendant under the Three Strikes law of 210 years to life does not constitute cruel and unusual punishment. (See *People v. Mantanez, supra,* 98 Cal.App.4th 354, 359; *People v. Martinez, supra,* at pp. 1516–1517; *People v. Goodwin, supra,* 59 Cal.App.4th 1084, 1094; *People v. Cooper, supra,* at pp. 826–828; *People v. Ingram, supra,* at p. 1413.)

---

[21] Upon its review of the country's recidivist statutes the court observed "that California is among the few states that impose a life sentence for a third felony conviction that is neither violent nor serious where at least one prior crime involved violence. While there are differences noted above, it may be said that California is not as harsh as Louisiana and Mississippi, which impose life without parole. California provides for a 25-year minimum term." (*People v. Martinez, supra,* 71 Cal.App.4th 1502, 1516.)

Accordingly, the judgment is affirmed.

Marchiano, P. J., and Stein, J., concurred.

A petition for a rehearing was denied June 21, 2007, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 29, 2007, S153991.