Filed 10/27/14  P. v. Good CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058431 |
| v. | (Super.Ct.No. SWF1201622 & SWF1203114) |
| GREGORY LANCE GOOD, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Elaine M. Johnson and Albert J. Wojcik, Judges.  Affirmed with directions.

Thomas E. Robertson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Meagan Beale and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I. INTRODUCTION

Defendant and appellant, Gregory Lance Good (Good), was charged in two separate cases with assault-related offenses occurring on two occasions. In one case, he was charged with assaulting three victims with a firearm and negligently discharging a firearm, on June 20, 2012. In a second case, he was charged with assaulting a firefighter by means of force likely to product great bodily injury and interfering with a firefighter in the performance of his duties, on August 14, 2012. The court granted the People's motion to consolidate the cases, and an amended information was filed alleging the same charges. (Pen. Code, §§ 245, subd. (a)(2) (counts 1, 2, & 3), 246.3 (count 4), 245, subd. (c) (count 5), 148.2, cl. (1) (count 6).)[1] It was further alleged, as it had been originally, that Good personally used a firearm in counts 1 through 3, and that counts 1 through 4 were serious felonies. (§§ 667, 1192.7, subd. (c)(8), 12022.5, subd. (a).)

A jury found Good guilty of the lesser offense of simple assault (§ 240) in counts 1, 2, and 3, and guilty as charged in counts 4, 5, and 6. A personal use enhancement was found true in count 4, even though it was not alleged. The jury found count 4 was a serious felony, and returned no findings on the enhancements alleged in counts 1, 2, and 3. Good was sentenced to four years eight months in prison, comprised of four years on count 5, plus eight months on count 4. Other terms were imposed concurrently or were stayed.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Good appeals, claiming: (1) the cases were erroneously consolidated for trial; (2) the court abused its discretion in allowing the prosecutor to present, in its rebuttal case, a DVD showing his "violent and aggressive" behavior in a prior incident; (3) the People violated his discovery rights in failing to disclose rebuttal evidence until after he testified; (4) the personal use enhancement on count 4 should have been stricken, not stayed; and (5) he is entitled to 167 days of additional conduct custody credits. (§ 4019.)

The People agree the personal use enhancement on count 4 must be stricken because it is an element of the underlying offense, and also agree Good is *eligible*, though not necessarily entitled, to the 167 days of additional conduct credits he seeks. We strike the personal use enhancement, exercise our discretion to award the additional conduct credits, and direct the trial court to prepare an amended abstract of judgment. We reject Good's other claims of error, and affirm the judgment in all other respects.

## II. FACTS AND PROCEDURAL HISTORY

A. *Prosecution Evidence*

### 1. The June 20, 2012, "Warning Shots" Incident (Counts 1-4) (SWF1201622)

On June 20, 2012, Cynthia Denhoed and her boyfriend Roddy Nelson were living in a home on Lewis Valley Road, in Sage, a rural area south of Hemet, with "[a] lot of brush, sage brush and oak groves and hills." Denhoed's parents lived in another home on the same property. Good lived alone on a remote property "up the hill" from Denhoed on Lewis Valley Road. Lewis Valley Road is a single lane dirt road.

3

Around 2004, Denhoed had a conflict with Good after he borrowed a book from her daughter. After Good had the book for a while and Denhoed and her daughter asked him to return it, he "threw it on the ground towards [the daughter] and walked away." Denhoed was angry, and told Good his behavior was uncalled for. Around 2010, Denhoed and a friend "were hiking up a creek" that Denhoed believed was not on Good's property, but Good angrily approached them, told them they were on his property, and "as he was speaking he was spitting." Denhoed told Good it was "not his property" and he had no right to "yell[] in her face." Denhoed heard there had been other verbal conflicts between Good and members of her family.

On June 20, 2012, Sanford Desborough was visiting Denhoed and Nelson at their home in Sage. Desborough had recently met Denhoed and Nelson, but had never been to their home before. Around midday, the group of three went walking up Lewis Valley Road to see the view from the top of the hill where the road ends. The weather was clear, and they were not carrying any firearms.

Denhoed, Nelson, and Desborough each had felony convictions, prohibiting them from possessing firearms (§ 29800), Denhoed had a 1997 conviction for possessing a controlled substance for sale, and Nelson had a 2003 conviction for selling drugs. Desborough had three drug-related felony convictions for possession for sale of a controlled substance and sale of a controlled substance in one 2007 case, and a 2001 conviction for manufacturing methamphetamine.

4

Good had placed a locked gate across Lewis Valley Road, blocking the road as it proceeds to the top of the hill. The group walked around the gate, continued walking on the road until they reached the top of the hill, then walked back down the road and around the gate a second time. Denhoed believed they had a "right of easement" to walk on the road, and Good had created another road that led to the top of another hill where his motor home was parked.

Just after the group walked around the gate on their way back down the hill, they saw Good "running up naked up the side of [the] hill," around 15 to 20 yards away from them. Denhoed saw that Good was running toward his motor home from an oak grove where she knew he had a trailer and a hot tub. As he ran by, Good did not say anything, and the group "laughed little bit." Two or three minutes later, the group heard gunshots.

Denhoed heard the first shot "whiz" by her left side and saw a second shot strike a boulder directly behind the group. Desborough testified the first shot "whizzed by" his head and another shot hit a rock. Nelson testified that two shots went by Denhoed and Desborough, and one shot hit a rock. After these shots were fired the group began running, and heard more shots. Denhoed believed there were four or five shots in total. Denhoed did not see Good when the shots were fired, but believed Good fired the shots because they came from the hilltop where his motor home was parked, and he lived alone. Desborough also saw that the shots were coming from the hilltop. The parties stipulated that the gate across Lewis Valley Road was 171 yards from the hilltop where Good's motor home was parked.

5

After the group returned to Denhoed and Nelson's home, none of them called 911, but Denhoed and Nelson knew Good would call 911 because "[h]e was a cop caller." As expected, Good called 911, and Riverside County Sheriff's Deputy Arman Morales contacted him near his gate on Lewis Valley Road. On a picnic table on the hilltop where Good's motor home was parked, Deputy Morales observed a Ruger .22-caliber rifle, fully loaded, with one round in the chamber. The rifle had recently been fired, and was apparently reloaded after it was fired. Deputy Morales spoke with Denhoed, Nelson, and Desborough, and ascertained that none of the firearms inside the nearby home of Denhoed's parents were loaded or had recently been fired.

2. The August 14, 2012, Firefighter Incident (Counts 5 & 6) (SWF1203114)

On August 14, 2012, firefighters and firefighting resources were dispatched to control a large brush fire in Sage called the Buck Fire. Heavy brush in the area had not burned in a long time. Several fire engines, including one led by Captain David Cabral of the California Department of Forestry, responded to Lewis Valley Road. The main front of the fire was moving slowly toward the area, and the firefighters were trying to protect buildings in the area by burning out their surrounding brush. Hose lines—made of cotton and one and one-half inches thick—were deployed on the ground in case one of the "burnout" fires got out of control.

Good drove up to Captain Cabral's crew in a small SUV, asked what the firefighters were doing in the area, and said a fire engine had driven up to his gate but had turned around and left. Good said no one was protecting his home and seemed upset.

6

Captain Cabral told Good to leave via Sage Road, and if he did not want to leave the captain would have to ask the county sheriff to escort Good out of the area. Good responded, "Go ahead; it won't be the first time that they've been here," and began to roll his SUV forward.

When Good drove up to Captain Cabral's crew, the captain saw that Good must have driven over an "active" hose line one the firefighters was "actually using" to control a fire. As Good was leaving after speaking with the captain, the captain asked Good if he was going to drive over the hose line again. Good said "[y]es," added, "I'm gonna do more for you than you did for me," and drove over the hose line again, even though he had enough room to drive away without driving over the hose line.

As Good was driving toward the hose line again, he accelerated his SUV toward the captain, after the captain stepped off an embankment toward the SUV. The captain then stepped out of the SUV's path, but Good accelerated his SUV toward the captain, apparently intending to hit him with his driver's side door or side mirror. As he drove by, Good reached out of his SUV with his left hand, indicating he intended to grab the captain or push him down. The captain swung a shovel he was carrying at the SUV, hitting it, and Good drove away. Tire marks on the captain's left boot showed Good ran over it with his SUV, but the captain was uninjured. Good's license plate number was written down and the incident was reported.

Richard Lake was working as a volunteer for the American Red Cross at the community center in Temecula, a shelter for evacuees of the Buck Fire. Good came to

7

the shelter, and told Lake he tried to hit a fireman who was standing in the roadway in front of a fire hose. Good said the fireman "swung at him through the window [of Good's SUV] and hit his steering wheel with a shovel." Good showed Lake a nick on the steering wheel of his SUV, and told him the fireman "brushed along" the side of his SUV and hit his mirror.

B. *Defense Case*

    1. Character Witnesses

Good presented several character witnesses who testified to his nonviolent character and reputation. In the late 1990's, Good's landlord, Michael Stack, rented the Sage property to Good, and has since met with Good several times a year to walk around the property and discuss "what we think is going on out there." In Stack's opinion, Good was a "[v]ery peaceful," "quiet person" who had a reputation as "[a] guy that lives at the end of the road and raises animals."

Bill Bell became acquainted with Good shortly after Bell moved to Lewis Valley Road around 2005. When Bell was grading the road after a rain, Good stopped to introduce himself and say thank you. Bell and Good saw each other and talked "at least once a year." In Bell's opinion, Good was "a meek, mild isolationist" who "[l]ikes to be by himself, take care of his animals and be left alone."

Debrah Kitchings and Good became friends after regularly running into each other at a Costco store around 2009. They would go to the food court at the Costco store and talk, and kept in contact by e-mail, but had never been to each other's homes. Kitchings

8

described Good as "peaceful," "calm" and "passive," as opposed to "aggressive," and as "leaning towards forgiving . . . ."

David and Theresa Crawford purchased a dog from Good and visited with him at dog shows and at dinner after the shows. In their opinions, Good was a "peaceful," "very nice person" who got "along great with people," and they had never seen any indication he was a violent person.

2. Good's Testimony

Testifying in his own defense, Good said he fired "warning shots," around nine minutes after he saw Denhoed, Nelson, and a man he did not recognize walk around his gate after they had obviously been trespassing on his property. He fired the shots because he needed to protect his property, and the shots were "an opportunity . . . to make that point." He felt threatened by "anybody who produces and distributes methamphetamine."

Good could not see the group after they walked around the gate, but he fired the warning shots in the opposite direction of where he thought they were walking. Someone from the group returned fire "with a large boom of a gun," and he stopped shooting after he fired his fifth shot and they did not return fire. He did not intend to shoot anyone, but to "make noise" with his warning shots. He called 911 because he was afraid and "in disbelief that they would have returned fire." At least six other times, he had called 911 to report trespassing.

9

On the day of the Buck Fire, the fire reached the front of Good's motor home, and he suffered second and third degree burns on his right shoulder when melting bits of the motor home ceiling dropped on him. His dogs ran away and survived the fire. Around 20 minutes before the fire reached his property, a fire engine drove to his opened gate but "backed up and left" before he could meet the firefighters and show them where his motor home was located.

Good drove down the hill and pulled up next to Captain Cabral, who was standing on a roadside embankment, and asked "who made the judgment call" to pull the fire engine away from his property. Good claimed he "was not upset at that point." After Captain Cabral told him he had to evacuate the area and threatened to call the sheriff's department if he did not leave, Good was frustrated and said "I'm gonna do more for you than you did for me," meaning he was going to leave and get out of their way. He admitted he drove over the hose line again, but had not heard anyone express any concerns about the hose line. All he could hear was the was the sound of his truck and the "pumper [water] truck."

When Good began to drive forward, Captain Cabral had stepped back onto the embankment. He accelerated as he drove toward the hose line, and at that point saw somebody coming down off the embankment holding a shovel like a baseball bat. Suddenly, "it appeared that a shovel was gonna hit [his] windshield." The captain stepped around the front of his truck to the driver's side window, and then he "saw the shovel coming at [his] head," and the shovel hit his steering wheel. He believed the

10

captain "lost his temper and attacked" him, so he accelerated and left the scene. He denied he accelerated or swerved *toward* anyone at any time, and denied telling Lake he tried to run over a fireman. Good denied his motor home burned *after* the incident with Captain Cabral, and claimed he was suffering from second and third degree burns on his hands and arms when he spoke to the captain. He did not ask for medical assistance because he knew he could deal with the burns himself.

The court took judicial notice of a record of conviction. On May 31, 2011, Good pled guilty to petty theft as an infraction (§ 490.1) and agreed to pay $119 in restitution to Dan's Feed and Seed. Good was charged with stealing bales of hay. When asked why he agreed to the plea, Good explained it was too expensive to go to trial. He claimed he had an arrangement with the feed store to pay for the bales of hay a week later, when he had money.

3. Other Defense Evidence

When Good was incarcerated in 2012, Robert Lucas went to Good's property to feed and water his dogs. A woman drove up and identified herself as "the person . . . that [Good] shot at and that they returned fire." Lucas saw the barrel of a rifle or shotgun inside the woman's truck. The woman said "they finally got him and they were gonna put him away for a long time," and "was very adamant that she wanted [Good] gone." Lucas saw the same woman in the hallway outside the courtroom, apparently referring to Denhoed.

11

C. *Prosecution Rebuttal Case*

Captain Cabral did not notice any burns on Good, and Good said nothing about having suffered any burns. Third degree burns usually require hospitalization. The captain denied holding his shovel like a baseball bat and swinging it at Good. Stack, Good's landlord, testified Good told him a fireman swung a shovel at him, and when he swerved to avoid it he accidentally ran over another fireman's foot. Good told Stack he was trying to get back to his motor home to save his dogs.

On January 19, 2012, Riverside County Code Enforcement Officer Brett Pollard and another officer went to Good's property to follow up on a case. Good came out of the brush, started yelling at the officers that they were trespassing, and ordered them to leave. The officers tried to "talk [Good] down a little bit" by telling him they could now close their case because Good was no longer living on the parcel of land he had previously been living on.

The officers got in their vehicles and drove up a narrow dirt road, intending to leave the property, but the road was blocked by a gate. Officer Pollard was driving a Ford Explorer with lights on the top and "Code Enforcement" painted on the sides. Having no room to turn around, Officer Pollard began backing down the hill. Good stepped into the road and blocked his path. Officer Pollard honked his horn and yelled at Good to get out of their way. Good moved to the right side of the road, leaving Pollard enough room to get by.

12

As Officer Pollard's vehicle passed by Good, Good "appeared to fling himself at the backside of [the vehicle], hitting it with his full body, and then he dropped to the ground." Officer Pollard stopped his vehicle, put it in park, grabbed a digital camera, and began recording what was happening. He recorded Good lying "on the ground yelling to get off of him," and yelling profanities.

The jury viewed a three minute, 42 second DVD of the incident (People's exhibit No. 27), and was given a transcript of the recording (People's exhibit No. 27A). The DVD shows Good using extensive profanity with the officers, being physically aggressive toward them, and falsely claiming he had been struck by one of their vehicles. Specifically, the DVD shows Good pounding on Officer Pollard's vehicle, lunging at him, invading his personal space, arguably bumping him with his chest, slapping the driver's side door of the other officer's vehicle, and hitting the top of the same vehicle with a closed fist. Good is heard on the DVD saying, "you fucker," "dumbass," "son of a bitch," and ordering the officers to "[g]et the fuck out of here."

D. *Defense Rebuttal Case*

Good identified photographs of burn scars on his right shoulder from the burns he suffered during the Buck Fire. Captain Cabral was standing on Good's left side when he spoke to Good through Good's driver's side window.

Code enforcement officers had been to Good's property more than a dozen times between 2006 and 2012, and Good had always been cooperative with them. On January 19, 2012, he told the officers they were trespassing and asked them to leave, but denied

13

he tried to prevent them from leaving. When Officer Pollard "went up that private road," Good followed him because he wanted to take pictures of the officer's vehicle next to his "[n]o [t]respassing" sign. After he got the pictures, he stepped off the road, the back corner of the officer's vehicle "clipped" him, and he was "slammed" to the ground. Good called the sheriff's department to report that the officer tried to run over him.

## III. DISCUSSION

### A. *The Warning Shots and Firefighter Cases Were Properly Consolidated for Trial*

Good claims the court prejudicially abused its discretion and violated his due process rights in granting the People's motion to consolidate the firefighter case with the warning shots case, requiring reversal and remand for separate trials. We conclude the cases were properly consolidated, and Good has not shown he was prejudiced by the consolidation.

#### 1. Relevant Background

In their motion to consolidate the two cases, the People argued consolidation was preferred because both cases involved assault-related crimes; joinder would promote judicial economy; evidence supporting the charges in one case would be admissible in the other case, because both "involve[d] the defendant becoming irate over the treatment of his home, one by his neighbors and the other by the firefighters"; and Good could not show he would be prejudiced in a joint trial.

In opposing the motion, Good argued consolidation would raise a substantial danger of undue prejudice because there was no cross-admissible evidence, and the

14

People had "two weak cases" and were "trying to bolster each by consolidation." Specifically, Good argued the charge of assaulting Captain Cabral would inflame the jury against him and increase his chances of being convicted of assaulting the trespassers. In addition, joinder would allow the prosecution to portray him "as a bad person, who becomes 'irate' over the treatment of his home."

The motion was heard on November 14, 2012, before trial commenced on January 2, 2013.[2] The court granted the motion after finding the charges were of the same class of crimes and noting the law favored consolidation in cases involving a single defendant and the same class of crimes. The court also noted it could give limiting instructions regarding any noncross-admissible evidence, and consolidation would not be unduly prejudicial.

2. Analysis

Section 954 authorizes the trial court to consolidate charges for trial, if the offenses are charged in separate pleadings but are "'connected together in their commission'" or "'of the same class of crimes.'" (*People v. Gray* (2005) 37 Cal.4th 168, 221; § 954.) Consolidation or joinder "'is the course of action preferred by the law.'" (*People v. Soper* (2009) 45 Cal.4th 759, 772.) An order consolidating charges for trial is reviewed on appeal for an abuse of discretion. (*People v. Gray, supra,* at p. 221.) The

---

[2] Judge Johnson heard and granted the People's motion to consolidate the cases. Judge Wojcik presided over the trial.

burden is on the party challenging the order to make a clear showing of prejudice and that the court's ruling falls outside the bounds of reason. (*People v. Soper*, *supra,* at p. 774.)

"'In determining whether there was an abuse of discretion, we examine the record before the trial court at the time of its ruling.' [Citation.] ""The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial.' [Citation.] . . ." [Citations.]' [Citation.] 'The factors to be considered are these: (1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges . . . .'" (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 557.)

Ordinarily, cross-admissibility dispels any inference of prejudice, but the absence of cross-admissibility alone does not demonstrate prejudice. (*People v. Soper, supra,* 45 Cal.4th at pp. 774-775; *People v. Sullivan, supra,* 151 Cal.App.4th at pp. 557-558.) Under section 954.1, evidence concerning one charge is not required to be admissible to prove another charge, in order for the charges to be tried together. Nonetheless, here the cases involved cross-admissible evidence on the issue of Good's intent, dispelling any inference that Good would be prejudiced by consolidation.

As the People argued, the evidence in each case tended to show Good became angry, even "irate," over the perceived mistreatment of his property, whether by

16

trespassing neighbors or firefighters who refused to protect it. Good's angry reaction to the trespassers and to Captain Cabral was relevant to prove he *intended* to assault the trespassers with a firearm and *intentionally* ran over the captain's foot. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [uncharged misconduct is admissible to prove intent if it supports an inference that the defendant "'"probably harbor[ed] the same intent in each instance."'"].)

Good argues the evidence in the firefighter case "was certain to inflame the jury and bleed into the weak case of the warning shots." We disagree. Nothing about Good's angry reaction to the trespassers or to Captain Cabral tended to evoke an emotional bias against Good, while having "very little effect on the issues." (*People v. Karis* (1988) 46 Cal.3d 612, 638 ["'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*.'" (Italics added.)].)

Nor was the evidence supporting the "warning shots" case apparently weaker, at the time the motion was granted, than the evidence supporting the firefighter case. The firefighter case was supported by the testimony of several firefighters, including Captain Cabral, and the warning shots case was supported by the testimony of the three hikers or trespassers. And if Good's angry reaction in each case promised to undermine his defense that he ran over the captain's foot by accident, and shot in the opposite direction the hikers were walking, that defense would have been equally undermined in separate

17

trials because, as discussed, the evidence of his reaction in each case would have been admissible in the other.

Additionally, Good has not shown he was actually prejudiced by the consolidation. Even if a trial court's order consolidating cases for trial is correct at the time it was made, reversal is required if the defendant shows the consolidation actually resulted in "'"""gross unfairness" amounting to a denial of due process.'""" (*People v. Earle* (2009) 172 Cal.App.4th 372, 387.) The record shows that consolidation of the two cases did not result in any gross unfairness, or actual prejudice to Good. Indeed, the jury acquitted Good of assaulting the three hikers with a firearm, apparently because it credited Good's testimony that he shot in the opposite direction the hikers were walking. Thus, the firefighter case did not prejudice the result in the warning shots case.

B. *The "Officer Pollard" DVD Was Properly Admitted in Its Entirety*

Good clams the trial court abused its discretion under Evidence Code section 352 in admitting the entire DVD of the January 19, 2012, encounter between himself and the two code enforcement officers, including Officer Pollard. He argues the DVD was unduly prejudicial because it showed him yelling and cursing, acting aggressively toward the officers, and pounding on the officers' vehicle, and its prejudicial portions could have been redacted. We conclude the entire DVD was properly admitted.

1. Relevant Background

After Good testified Captain Cabral "attacked" him by swinging a shovel at him, the People sought to present, in its rebuttal case, the testimony of Officer Pollard and the

18

DVD he took of his January 19, 2012, encounter with Good.  The prosecutor argued Good had been claiming since the preliminary hearing that he ran over the captain's foot by accident, but was now claiming for the first time that the captain had attacked him, and the defense conducted jury voir dire based on accident.  The prosecutor also pointed out the Officer Pollard incident was "just way too similar" to the incident involving Captain Cabral, and explained:  " I had no idea [Good] would claim that he was attacked by the firefighter.  So now that he has I think that report [of the Officer Pollard incident is] relevant.  [¶]  . . . This is not the first time [Good has] claimed that somebody . . . from an agency like that has attacked him."

The trial court concluded the rebuttal evidence showed "a pattern of conduct," and its probative value would not be substantially outweighed by any prejudice against Good. The court explained:  "If [Good] did not testify that he was attacked by a firefighter, the admission of the current evidence of this other incident would be very, very problematical.  [¶]  It would appear to the court that the incident itself would be rebuttal. When the People became aware of this, they revealed the information forthwith.  The probative value would not be substantially outweighed by the probability of prejudicing the jury against [Good]."  After the jury heard Officer Pollard's rebuttal testimony and watched the DVD, the court instructed the jury to consider the officer's testimony and the DVD for the sole purpose of evaluating Good's claim that Captain Cabral attacked him.[3]

---

[3]  The limiting instruction, prepared by both counsel, told the jury:  "People's exhibit 27 [the DVD recording] and the testimony of Code Enforcement Officer Pollard are being admitted for a limited purpose.  The limited purpose is for the evaluation of

*[footnote continued on next page]*

2. <u>Analysis</u>

Under Evidence Code section 352, the trial court determines whether the probative value of evidence is substantially outweighed by the probability its admission would, among other things, create a substantial danger of undue prejudice. In this context, evidence is prejudicial if it "'"'uniquely tends to evoke an emotional bias against a party as an individual'"'" or would cause the jury to prejudge a person or cause on the basis of extraneous factors. (*People v. Foster* (2010) 50 Cal.4th 1301, 1331.)

On the other hand, "'"'[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.' The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues.*"' [Citations.]"'" (*Donlen v. Ford Motor Co.* (2013) 217 Cal.App.4th 138, 150.)

We review a trial court's rulings under Evidence Code section 352 for an abuse of discretion. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1089-1090.) The trial court

_____

*[footnote continued from previous page]*
[Good's] testimony that Captain Cabral attacked him. It is up to you to decide the meaning and importance of this evidence in relation to that limited purpose. [¶] This evidence cannot be considered by you for any purpose other than the limited purpose for which it was admitted. [¶] Do not consider this evidence for any purpose except the limited purpose for which it was admitted.

20

"enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) The trial court's exercise of this discretion "'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*Id.* at pp. 1124-1125.) Likewise, the court has "broad discretion to determine admissibility of rebuttal evidence," and its exercise of that discretion may not be disturbed on appeal "absent palpable abuse." (*People v. Valdez* (2012) 55 Cal.4th 82, 170.)

As the trial court concluded, the DVD was highly probative of the credibility of Good's testimony that Captain Cabral "attacked" him with a shovel just before he ran over the captain's foot with his vehicle. Good's trial testimony suggested he was justified in running over the captain's foot, because doing so allowed him to drive away quickly and avoid further attack and possible injury. The DVD directly impeached Good's testimony that the captain attacked him with a shovel, because it showed Good falsely and self-servingly claiming that Officer Pollard had just attacked him by trying to run over him with the officer's vehicle.

To be sure, the DVD showed Good using profanity and being physically aggressive toward Officer Pollard and the other code enforcement officer. But the court reasonably determined that the probative value of the DVD on the question of Good's credibility in claiming Captain Cabral attacked him was not substantially outweighed by

21

the probability its admission would be unduly prejudicial to Good, based on Good's use of profanity and physical aggression toward the officers. (Evid. Code, § 352.)

As stated, "'''"[t]he 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues.*"' [Citations.]"''" (*Donlen v. Ford Motor Co., supra,* 217 Cal.App.4th at p. 150.) And here, *the same evidence* that showed Good using profanity and physical aggression toward officers showed Good falsely accusing Officer Pollard of trying to run over him. (See, e.g., *People v. Lewis* (2009) 46 Cal.4th 1255, 1281-1283 [gruesome photographs of murder victim not unduly prejudicial in light of their probative value on "significant issues"].)

Indeed, the portions of the DVD showing Good swearing and being physically aggressive could not have been redacted without eliminating the portions that showed Good falsely accusing Officer Pollard of trying to run over him. Contrary to Good's claim, the DVD was not "divisible" into two segments: "(1) the beginning, where Good accuses the officer of striking Good with his vehicle; and (2) the ensuing tirade during which Good verbally accuses two officers and confronts them with acts of physical aggression." To the contrary, Good uses profanity throughout his encounter with the officers, and the latter part of the encounter, which takes place after Good has come out from under the side of Officer Pollard's vehicle and is being physically aggressive toward the officers, is critical to the prosecution's claim that Good was malingering, and that Officer Pollard *did not and could not have* run over him.

22

C. *The Office Pollard Rebuttal Evidence Was Timely Disclosed to the Defense*

Good claims the People violated his discovery rights in failing to disclose the identity of Officer Pollard, his report, and the DVD of the January 19, 2012, incident in which Good claimed Officer Pollard tried to run over him, until after Good testified at trial that Captain Cabral "attacked" him. We find no discovery violation.

Under California's reciprocal discovery law (§ 1054 et. seq.), the prosecution is required to disclose certain evidence to the defense at least 30 days before trial, including evidence it intends to present in rebuttal (§§ 1054.1, 1054.7; *People v. Gonzalez* (2006) 38 Cal.4th 932, 956). This includes "[t]he names and addresses of persons the prosecutor intends to call as witnesses at trial" (§ 1054.1, subd. (a)), and "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial . . ." (§ 1054.1, subd. (f)). The prosecution is required to immediately disclose discoverable material and information that becomes known to it or that comes into its possession within 30 days of trial. (§ 1054.7.)

Good made an informal discovery request in September 2012 and trial commenced in January 2013. Yet Officer Pollard's identity as a rebuttal witness, his report of the January 2012 incident, and the DVD recording of the incident, were disclosed to the defense on January 17, 2013, the day after Good testified Captain Cabral attacked him by swinging a shovel at him. Defense counsel filed a motion to exclude the rebuttal evidence. The trial court denied the motion, noting it would "let the jury evaluate who is attacking who."

23

Good argues his defense that the captain attacked him with a shovel before he ran over the captain's foot with his vehicle was known to the prosecution shortly after he was arrested in August 2012. Following his arrest, Good told an investigating officer that "[t]he firefighter was coming after me," the officer recorded the statement in his report, and the prosecution must have known about the officer's report by October 5, 2012, at the latest, when the officer used it to refresh his recollection at the preliminary hearing. In addition, Officer Pollard reported the January 19, 2012, incident shortly after it occurred and the district attorney reviewed the incident and decided not to prosecute Good based on it.

Good argues the prosecution was aware of the incident involving Officer Pollard long before trial, and therefore had a duty to disclose it at least 30 days before trial. (§§ 1054.1, 1054.7.) But as the prosecutor argued in the trial court, the relevancy of the incident as rebuttal evidence only became apparent to the prosecution after Good testified Captain Cabral "attacked" him with a shovel. Only then did it become apparent that Good was claiming self-defense, rather than *or in addition to* accident, as his defense to the charge that he intentionally assaulted Captain Cabral by running over the captain's foot.

Contrary to Good's argument, his statement to the investigating officer that "[t]he firefighter was coming after me," did not clearly indicate that he would be claiming self-defense. Good did not tell the investigating officer that the captain swung a shovel at his head, or that he felt the captain was attacking him. As the prosecutor also pointed out,

24

Good conducted jury voir dire based on accident, and had been claiming since the preliminary hearing that he accidentally ran over the captain's foot.

The prosecution should not be faulted for failing to grasp the relevancy of the Officer Pollard incident as rebuttal evidence until after Good testified. As the Fifth District Court of Appeal has explained: "A trial is not a scripted proceeding. Rather, it is a process which ebbs and flows with emotion and drama as well as stretches of boredom and tedium. However, during the trial process, things change and the best laid strategies and expectations may quickly become inappropriate: witnesses who have been interviewed vacillate or change their statements; events that did not loom large prospectively may become a focal point in reality. Thus, there must be some flexibility. After all, the '"true purpose of a criminal trial"' is '"the ascertainment of the facts."' [Citation.] After hearing a witness, the necessity of a rebuttal witness may become more important." (*People v. Hammond* (1994) 22 Cal.App.4th 1611, 1624.)

D. *The Personal Use Enhancement on Count 4 Must Be Stricken, But the Jury's Serious Felony Finding in Count 4 Must Be Reflected in the Abstract of Judgment*

The trial court imposed but stayed a four-year term on the section 12022.5, subdivision (a), personal use enhancement on count 4, on the ground it was an element of the offense of negligently discharging a firearm. (§ 246.3.) Good claims, and the People agree, that the section 12022.5, subdivision (a) enhancement on count 4 should have been *stricken*, rather than stayed, precisely because it is an element of negligently discharging a firearm. We agree.

25

Section 12022.5, subdivision (a) states it does not apply to an offense if the "use of a firearm is an element of that offense." The personal use of a firearm is an element of negligently discharging a firearm. (*People v. Overman* (2005) 126 Cal.App.4th 1344, 1361 [Fourth Dist., Div. Two] [elements of § 246.3 include the defendant's intentional discharge of a firearm].) Thus, the section 12022.5, subdivision (a) enhancement cannot be imposed on count 4.

As the People point out, the operative, amended information in the consolidated cases alleged Good personally used a firearm in counts 1, 2, and 3, pursuant to section 1192.7, subdivision (c)(8) ("serious felony" means any felony in which the defendant personally uses a firearm) *and* section 12022.5, subdivision (a) (personal use enhancement). In count 4, it was alleged that Good "personally used a firearm, within the meaning of . . . sections 667 and 1192.7[, subdivision] (c)(8)," but the personal use enhancement was *not* alleged.

Nonetheless, the enhancement verdict form on counts 1 through 4 referred to the serious felony *and* the personal use statutes. When the jury found Good guilty of the lesser offenses of simple assault in counts 1, 2, and 3 (§ 240), and not guilty of the charged offenses of assault with a firearm (§ 245, subd. (a)(2)), it did not sign any of the enhancement verdict forms on counts 1, 2, and 3, including the "not true" enhancement forms.

As the People point out, though the section 12022.5, subdivision (a) enhancement in count 4 must be stricken, the jury's finding that the negligent discharge of a firearm

26

constitutes a serious felony must remain. The serious felony finding does not appear in Good's current abstract of judgment. Thus, the abstract must be amended to reflect the negligent discharge of a firearm, of which Good was convicted in count 4, is a serious felony within the meaning of sections 667 and 1192.7, subdivision (c)(8).

E. *Additional Conduct Custody Credits (§ 4019)*

Good was awarded 29 days of presentence conduct custody credits, or 15 percent of the 196 days he actually served in custody before sentencing, for a total of 225 days of presentence custody credits. (§ 2933.1, subd. (a) ["any person who is convicted of a felony offense listed in subdivision (c) of Section 667.5 shall accrue no more than 15 percent of worktime credit, as defined in Section 2933."].) Good claims that because his personal use enhancement on count 4 must be stricken, he was not convicted of a felony listed in section 667.5, subdivision (c). Thus, he argues, he should have been awarded one day of conduct custody credit for each day he served in custody, or 196 conduct days, for a total of 392 days of presentence credits.

For crimes committed after October 1, 2011, local inmates may earn day-for-day conduct credits. (*People v. Lara* (2012) 54 Cal.4th 896, 906, fn. 9; § 4019, as amended by Stats. 2011, ch. 15, § 482.) Good committed the current crimes on June 20 and August 14, 2012, and is therefore eligible to receive day-for-day conduct custody credits under section 4019. (§ 2933, subd. (c) ["Credit is a privilege, not a right. Credit must be earned and may be forfeited pursuant to the provisions of Section 2932."].)

The People concede Good "is eligible to *earn*" day-for day conduct credits under section 4019, but argue he is not necessarily entitled to them, and the matter should be remanded for the limited purpose of determining how many conduct credits he should receive, in addition to the 29 days.[4] Good argues the court's award of "the *full* 15%" conduct credits under section 2933.1 "implicitly established that [he] had met the behavior requirements for earning the maximum custody credits" under section 4019. We need not resolve this dispute because, as the People concede in the alternative, this court is authorized to modify the judgment to award Good the full 196 days of conduct credits, "as an act of leniency and to save judicial resources . . . ."

We modify the judgment and award Good the full 196 days of conduct credits. (§ 4019.) This will spare the parties and the trial court the inordinate expense of determining whether Good is entitled to 196 days of conduct credits, or any number of conduct credits between 29 and 196 days, and resentencing him. (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1473; § 1260.)

## IV. DISPOSITION

The judgment is modified as follows: (1) strike the four-year, section 12022.5, subdivision (a) personal use enhancement the trial court imposed but stayed on count 4;

---

[4] The People concede that Good's good conduct custody credits were limited to 15 percent of the number of days he served because count 4 was treated as a violent felony based on the personal use enhancement. (§ 667.5, subd. (c)(8) [listing a "violent felony" as including "any felony in which the defendant uses a firearm . . . ."].) The probation department did not determine whether Good should have received day-for-day conduct credits under section 4019, apparently because it believed Good had suffered a violent felony conviction and was therefore ineligible for day-to-day conduct credits.

(2) reflect that count 4, in which Good was convicted of the grossly negligent discharge of a firearm (§ 246.3), is a serious felony within the meaning of sections 667 and 1192.7, subdivision (c)(8); and (3) increase Good's conduct custody credits from 29 days to 196 days, for a total of 392 days of presentence custody credits, rather than 225 days. The trial court shall prepare an amended abstract of judgment reflecting these modifications to the judgment and forward a copy of the amended abstract to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING

J.

We concur:

HOLLENHORST

Acting P. J.

MILLER

J.

29